(No. 69847.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILBUR SCHARLAU *et al.*, Appellants.

*Opinion filed November 30, 1990.—Rehearing denied*
*February 4, 1991.*

MILLER, J., took no part.

Everett L. Laury, of Hutton, Laury, Hesser & Lietz, and M. Eugene Wright, all of Danville, and Matthias A. Lydon and Jayne Carr Thompson, of Lydon & Griffin, of Chicago, for appellants.

Neil F. Hartigan, Attorney General, of Springfield, and Craig H. DeArmond, State's Attorney, of Danville, for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendants, Wilbur Scharlau, Ernie A. Cox, Jerome D. Brown, and Raymond T. Randall, were all serving as elected commissioners of Danville during the relevant times involved in this case. Defendant Scharlau, however, was acting mayor during these events because the elected mayor had resigned. Defendant Wendell Wright was corporation counsel of the City of Danville. All defendants were convicted of official misconduct (Ill. Rev. Stat. 1989, ch. 38, par. 33—3(c)) and of violating the prohibition against municipal officials' having pecuniary interests in contracts involving the governmental unit they serve (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a); ch. 102, par. 3(a)) in the circuit court of Vermilion County. The appellate court reversed, holding that the statutes under which defendants were convicted did not apply in this case. (193 Ill. App. 3d 280, 292-94.) We

granted the State's petition for leave to appeal (107 Ill. 2d R. 315), and we reverse.

Defendants had been prosecuted after they had settled a Federal class law suit brought pursuant to the Voting Rights Act of 1965 (42 U.S.C. §1973b (1982 & Supp. V 1987)). This law suit involved allegations that the City of Danville's election practices diluted minority voting strength. The terms of the settlement changed Danville's municipal government from a mayor-commissioner system, where commissioners were elected citywide, to a mayor-alderman system with the City divided into separate aldermanic districts. However, the settlement also guaranteed that defendants would be placed, by appointment, in newly created administrative positions, called "department heads," for three years at a fixed salary which defendants were given the power to determine.

## BACKGROUND

Because the facts and procedural history of this case are explained in detail in the appellate court's opinion, we will only recite the facts necessary for the disposition of this appeal. In January 1987, defendants were nearing the end of their four-year terms as commissioners of the City of Danville and were anticipating running for reelection in February. At that time, a group of African American residents of Danville filed a Federal lawsuit against the city and its commissioners alleging that the nonpartisan, at-large, city-wide process for electing commission members excluded African American representation and diluted their voting strength.

One month later, the parties to this lawsuit filed a stipulation for a consent decree. This stipulation provided for Danville's form of government to change from a mayor-commissioner system to a mayor-aldermen system. For the defendants, the stipulation provided that:

(1) for three years after the first general election under the new government, the commissioners would continue in office as the administrators of various departments which corresponded to their commission duties; (2) the occupants of these administrative, or "department head," positions would not be members of the city council and would have no legislative duties; (3) the administrators could be removed only by a majority vote of the city council for "misfeasance or malfeasance"; and (4) the current commissioners would determine the salaries for the new department heads, and these salaries could not change for four years.

The Federal district court originally entered a consent decree incorporating the stipulation's language. (193 Ill. App. 3d at 284.) The Federal district judge later vacated this order and held hearings on the proposed settlement. At that time, several parties filed motions to intervene, arguing that the negotiation process used by defendants to reach the settlement violated State conflict-of-interest statutes and public policy. For this reason, the Vermilion County State's Attorney also was then made a party to the action.

These hearings revealed that defendants knew that they could not hope to prevail in the litigation. However, defendants had argued during negotiations that they needed to remain in office for a period of time after the new aldermen were elected in order to guarantee a smooth transition. Defendants indicated that the specific provisions regarding salary, length of term, and removal were compromises upon which the voting rights plaintiffs agreed in the interest of protecting defendants from any reprisals by the new aldermen. Both sides agreed that, even though defendants could not hope to prevail in the suit, the settlement was a reasonable means of avoiding prolonged and expensive litigation.

The State's Attorney argued throughout these proceedings that the settlement agreement violated State conflict-of-interest laws. The district judge repeatedly warned the State's Attorney that the court would not allow him to argue the merits of such claims, and indicated several times that the State's Attorney would have the opportunity to pursue the prosecution of defendants after a settlement were entered. At the conclusion of the hearings, the district judge entered an order which found that the voting rights plaintiffs had a reasonable likelihood of success on the merits. He stated that, however, both parties to the suit had negotiated a reasonable settlement considering the potential length and cost of litigation and defendants' concern for an orderly transition. Particularly, he found that the provision for the three-year transition term provided stability and continuity of government. In an apparent contradiction of his earlier statements to the State's Attorney, the district judge found the settlement did not violate Illinois law and that the commissioners had not violated their fiduciary duty to the city. In reading his opinion into the record, the district judge stated:

"[D]efendants, aside from avoiding years of turmoil, have saved the city the crippling expense of the litigation and diminished the cost of salaries for administrative officers. The city, had the litigation continued, would have paid commissioners' salaries for at least four and probably five more years. The defendants did not *** secure a personal advantage in conflict with their duty to serve the city ***. If the Illinois statutes are in conflict with the settlement, and I conclude they are not, then the state statutes should give way to the policy of the federal law. I conclude the proposed decree is fair, adequate, and reasonable and that it does not violate state or federal law."

Soon after the consent decree was entered, defendants stood trial in the circuit court of Vermilion County on charges of violating State conflict-of-interest statutes.

During those proceedings, each defendant testified regarding the settlement process. Defendants admitted that they had no right to require that they retain their jobs as a condition of settling the voting rights lawsuit and that they were not legally entitled to retention. All defendants had testified at grand jury proceedings that they would receive personal benefits under the Federal consent decree and that they would never have considered agreeing to the settlement without the retention provisions.

Defendant Wright testified that defendants as a group felt that they were being asked to sacrifice their personal positions and that "if they were going to give up something, they were entitled to something in return." Although they did not use the issue in the negotiation process, Wright indicated that defendants had discussed among themselves which of their pensions would vest within the next three years. Defendants argued that their major concern was for an adequate transition, not for pension security. Wright also admitted that he had been aware that the Federal court had the ability to fashion the terms of settlement without the direct involvement of defendants in the negotiation process.

The State also introduced into evidence an indemnification ordinance which defendants enacted less than two weeks after the Federal court approved the consent decree. The ordinance, suggested by defendant Wright, provided indemnification by the city to its appointees (who included Wright along with the former commissioners) and further extended indemnification to include "any criminal action or proceeding if the indemnified person had no reasonable cause to believe his conduct was unlawful and any act or omission within the scope of the office or employment."

The circuit court found all defendants guilty. The former city commissioners were sentenced to two years'

conditional discharge and fined $1,000 each. The court sentenced defendant Wright to two years' conditional discharge, 90 days in jail, and a fine of $5,000.

The appellate court reversed. Concentrating on the language of the Illinois Municipal Code (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a)), the Corrupt Practices Act (Ill. Rev. Stat. 1989, ch. 102, par. 3(a)), and the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 33—3), the court determined that the conflict-of-interest provisions contained in each of these enactments were not applicable to defendants' case. The pertinent language of each statute follows.

Section 3—14—4(a) of the Illinois Municipal Code states:

> "No municipal officer shall be *interested*, directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any *contract*, work or business of the municipality, or in the sale of any article, whenever the expense, price or consideration of the *contract*, work, business or sale is paid either from the treasury or by any assessment levied by any statute or ordinance." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a).)

Section 3(a) of the Corrupt Practices Act states:

> "No person holding any office, either by election or appointment under the laws or constitution of this state, may be in any manner *interested*, either directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any *contract* or the performance of any work in the making or letting of which such officer may be called upon to act or vote." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 102, par. 3(a).)

Section 33—3 of the Criminal Code of 1961 states:

> "A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:

(a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or

(b) Knowingly performs an act which he knows he is forbidden by law to perform; or

(c) *With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority*; or

(d) Solicits or knowingly accepts for the performance of an act a fee or reward which he knows is not authorized by law." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 33—3.

The appellate court first cited to this court's traditional view of statutory interpretation. We have held that a court's interpretation and construction of statutes are governed by the principle that the legislature's intention is to be ascertained and given effect. (193 Ill. App. 3d at 290, citing *Benjamin v. Cablevision Programming Investments* (1986), 114 Ill. 2d 150.) The appellate court also noted that where the terms of a statute are not defined, they are given their ordinary meaning, unless this would defeat legislative intent. (193 Ill. App. 3d at 290, citing *People v. Hicks* (1984), 101 Ill. 2d 366.) The court further noted that penal statutes are strictly construed, and that any ambiguities in criminal statutes should be interpreted in favor of lenity. 193 Ill. App. 3d at 290-91, citing *People v. Alejos* (1983), 97 Ill. 2d 502.

The appellate court then examined the language of the statutes in question and considered the purposes for which they were enacted. The court concluded that the language and purpose of this legislation presented a "sweeping prohibition against public officials and officers engaging in conduct which divides their loyalty between their personal interests and their fiduciary duties." (193 Ill. App. 3d at 292.) The court held that defendants' interest in continued employment did constitute a personal interest under this statutory scheme. The court also explained that bad faith or intentional wrongdoing is not

necessary to support a conviction under the Illinois statutes which prohibit self-dealing. (193 Ill. App. 3d at 292, citing *Miller v. County of Lake* (1980), 79 Ill. 2d 481.) Therefore, the court held that defendants' arguments that they had acted with good intentions, and that the end result of defendants' actions benefited the city, did not preclude defendants' convictions. 193 Ill. App. 3d at 292.

The appellate court, however, found that, because the terms "contract" and "interest" are not defined in the express language of the statutes, there is an inherent ambiguity when the legislation is applied to defendants' case. The court stated that the Illinois cases addressing conflicts of interest in this area all deal with situations where an official's personal interest could be severed from official duties. (193 Ill. App. 3d at 293, citing *People v. Savaiano* (1976), 66 Ill. 2d 7.) The case at bar, however, involved the "mixed-interests" of defendants. The court reasoned that the fiduciary duty which defendants owed the city and any personal interest in a potential settlement were "inextricably linked together by the situation presented to them." 193 Ill. App. 3d at 293.

The appellate court explained that defendants were duty-bound to resolve the voting rights lawsuit in the best interests of the city. The litigation also presented defendants with the potential loss of their jobs. The court determined that defendants could not have negotiated the settlement without discussing a transitional government; this meant that, in the appellate court's eyes, the impact on defendants' personal interests was unavoidable. The court concluded that "in a mixed-interest situation *** the conflict-of-interest statutes are not violated by negotiating a settlement which includes an *incidental personal benefit.* Settlement of the lawsuit was within the scope of the defendants' public duties, their actions were open to public scrutiny, and no practi-

cal manner existed for the defendants to remove themselves from the negotiation and settlement process." (Emphasis added.) 193 Ill. App. 3d at 293.

## ARGUMENT

The State contends that the appellate court relied on the proper rules of statutory construction in interpreting the conflict-of interest statutes, but failed to apply them correctly. The State argues that there are no inherent ambiguities in any of these statutes. It contends that, given that these statutes are not ambiguous, there is no need to be lenient when interpreting these criminal statutes, because both the legislative intent and the evil that the General Assembly sought to address by enacting these statutes is obvious. (See *Alejos*, 97 Ill. 2d at 511-12.) They also disagree with the appellate court's articulation of an exception for "mixed-interest" cases, arguing that the statutory language clearly indicates that public officers may gain no personal interest in a municipal transaction and opining that, even if the legislature intended for public officials such as defendants to be able to receive some minute personal benefit if the product of the transaction or incident is totally beneficial to the city, there is nothing "incidental" about the benefits defendants gleaned from the settlement agreement. The State further argues that there are alternative methods of settlement negotiation which would have allowed defendants to reach an agreement without including themselves in the settlement process, and contends that the conflict of interest in the case at bar is entirely volitional.

Defendants respond by claiming that they had simply exercised their proper governmental authority in negotiating a settlement to the voting rights case that was in the best interests of the city. Defendants support this position by looking to the statements of the Federal district judge, who said that defendants had not violated

their fiduciary duty, that the agreement was sensible and entered into in good faith, and that by settling the lawsuit defendants served the city well by saving Danville's taxpayers from the crushing burden of protracted and expensive litigation while providing the city with a smooth transition to the new government. They also claim that the State did not follow proper procedural channels and should have appealed the substance of the consent decree rather than prosecuting defendants; they suggest that the State is punishing them for doing their job. They also argue that they should have been allowed to rely on the Federal district court's statement that the settlement did not violate State law as an affirmative defense in their subsequent prosecution, and that legislative immunity should have precluded their prosecution.

## ANALYSIS

We agree with the State that defendants were properly convicted under the conflict-of-interest statutes and therefore reverse the judgment of the appellate court. We recognize that the dispositive issue in the case at bar is the proper construction of the statutes in question. We agree with the State that the appellate court recited the proper principles of statutory construction but then failed to cogently apply that law to the facts of this case.

As we have said, the judicial role in construing statutes is to ascertain legislative intent and give it effect. To aid in accomplishing this, a court will seek to determine the objective the legislature sought to accomplish and the evils it desired to remedy. (*City of Springfield v. Board of Election Commissioners* (1985), 105 Ill. 2d 336, 340-41.) We have no quarrel with the conclusion at which the appellate court arrived by using these principles of statutory construction; it found that the legislative intent in enacting these statutes was to codify "sweeping prohibition[s] against public officials and officers engaging in

conduct which divides their loyalty between their personal interests and their fiduciary duties." (193 Ill. App. 3d at 292.) We find, however, that the appellate court erred in not applying these sweeping prohibitions to defendants' conduct.

Courts normally are required to interpret words in a statute according to their plain and ordinary meaning (*People v. Moore* (1978), 69 Ill. 2d 520, 523), unless this would defeat the legislative intent (*Hicks,* 101 Ill. 2d at 371). We find that the appellate court's construction and application of the terms "interest" and "contract" in these statutes violates this "plain-meaning" principle.

We cannot see how the words "interest" and "contract" as used in the statutes in question can be interpreted as ambiguous. If the legislature intends for general words to apply to a certain situation without restriction, it will generally use a single, compendious word in the statutory language. (*People v. Capuzi* (1960), 20 Ill. 2d 486, 494.) "Interest" is just such a word. The term is general enough in scope to encompass the most basic right, claim, title, or legal share in something. (See Black's Law Dictionary 729 (5th ed. 1979).) We do not find that the sweeping scope of the word "interest" causes an ambiguity; rather, we find that the legislature's use of a compendious term with broad applications indicates a clear intent to broadly construe what constitutes an "interest" for the purpose of these statutes. Had the General Assembly intended otherwise, it either would have defined the parameters of the term, or would have modified it with more specific language. If the overall legislative intent behind these statutes is to enact "sweeping prohibition[s] against public officials and officers engaging in conduct which divides their loyalty between their personal interests and their fiduciary duties" (193 Ill. App. 3d at 292), to consider the term "interest" as contained in the legislation to be ambigu-

ous, apparently because it can be broadly applied, would tend to severely limit the "sweep" of any prohibitions the statutes were designed to provide. We note, however, that the appellate court interpreted defendants' "interests" in this case as not to preclude conviction. 193 Ill. App. 3d at 292.

We can apply the same analysis to the term "contract." We believe that we understand the apparent misgivings the appellate court had in applying section 3(a) of the Corrupt Practices Act and section 3—14—4(a) of the Illinois Municipal Code to the case at bar. The context in which the term "contract" is used appears to imply traditional business-type transactions. But the plain meaning of the term "contract" extends to a myriad of situations. The common law defines "contract" broadly, as "an agreement which creates an obligation." (17 C.J.S. *Contracts* §1(a) (1963).) While defining this word differs from defining the term "interest" within these statutes, in that "contract" is modified by other terms such as "work" and "business," the difference is not great. These two latter terms are also compendious, and envision a broad range of behavior and relationships.

We think that the appellate court focused on too narrow a portion of these statutes when it attempted to define "contract." Section 3—14—4(a) of the Illinois Municipal Code states that "[n]o municipal officer shall be interested *** in any contract, work or business *of the municipality* ***." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 24, par. 3—14—4(a).) Section 3(a) of the Corrupt Practices Act states that "[n]o person holding any office *** may be in any manner interested *** in any contract or the performance of any work *in the making or letting of which such officer may be called upon to act or vote*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 102, par. 3(a).) Thus, the context in which the word "contract" appears in these statutes indicates that public offi-

cers are prohibited only from having interests in contracts which obligate the municipality, or from having interests in contracts which the officers have made or allowed and in which they will be called upon to approve of or perform while acting in their official capacity. Therefore, we conclude that the term "contract," as used in these statutes, will not be construed as broadly as the term "interest" as used in the same statutes.

This does not mean, however, that the consent decree is not a "contract" for purposes of these statutes. The consent decree is obviously an "agreement which creates an obligation." It also is an agreement which obligated the City of Danville and is an agreement which defendants had made and which they were called upon to approve of while acting in their official capacity. Further, Illinois law holds that consent decrees or judgments are merely recitations of the settlement agreement which the parties reached. (*Clark v. Standard Life & Accident Insurance Co.* (1979), 68 Ill. App. 3d 977, 983.) Consent decrees entered by courts to effectuate settlement are therefore considered contracts between the parties to the litigation, and accordingly the law of contracts controls their interpretation. (*Kandalepas v. Economou* (1989), 191 Ill. App. 3d 51, 54; *Citizens Utilities Co. v. Centex-Winston Corp.* (1989), 185 Ill. App. 3d 610, 613; *Prairie Material Sales, Inc. v. White Diamond, Inc.* (1987), 157 Ill. App. 3d 779, 784.) The interpretation of any consent decree should be determined by the language of the parties (*Clark*, 68 Ill. App. 3d at 983), and such decrees do not represent the judgment of a court (*Kandalepas*, 191 Ill. App. 3d at 54).

Thus, the consent decree cannot be characterized as a court order but must be interpreted as if it were an independent contractual agreement, controlled by the law of contracts. In effect, the settlement agreement between the voting rights plaintiffs and defendants was a

contract which consisted of a covenant not to sue exchanged for a promise of employment. Even though we recognize that the language of sections 3—14—4(a) and 3(a) both imply traditional business-type transactions, we find that a contract consisting of the terms found in the settlement agreement in the case at bar can be interpreted as just such a business transaction. We therefore find that because the common law defines a consent decree as a contract, the consent decree in the case at bar is a contract for purposes of sections 3—14—4(a) and 3(a).

We also find the appellate court's analysis of the relevant statutory language in this case to be insufficient because the court never specifically addressed the language of section 33—3 of the Criminal Code of 1961. Section 33—3 states that a public officer commits misconduct when the officer performs an act "in excess of his lawful authority" to "obtain a personal advantage for himself." (Ill. Rev. Stat. 1989, ch. 38, par. 33—3(c).) The appellate court recognized that defendants had clearly obtained a personal advantage under the settlement agreement, but held that settling the lawsuit was "within the scope" of defendants' public duties. (193 Ill. App. 3d 280.) The court apparently determined that, because it was a proper function of defendants' offices to settle the lawsuit, the prohibitions of section 33—3 were inapplicable to the case at bar.

We disagree. Defendants had a duty to act in the best interests of the city. They also had a duty to refrain from using their positions as city commissioners for personal benefit. We agree that defendants' settling the lawsuit was within their lawful authority. We find, however, that defendants' arranging for their own employment for a fixed term and salary was outside that authority. Public officials are expected to adhere to the highest standards of ethical conduct. (See *Savaiano*, 66 Ill. 2d at 15;

Comment, *Illinois Conflict of Interest Law and Municipal Officers*, 12 S. Ill. U.L.J. 571, 571-72 (1988) (quoting President Kennedy, who said that "No responsibility of government is more fundamental than the responsibility of maintaining the highest standards of ethical behavior \*\*\*. There can be no dissent from the principle that all officials must act with unwavering integrity, absolute impartiality and complete devotion to the public interest," and citing O. Reynolds, Local Government Law §84 (1982)).) The lawsuit in the case at bar could have been settled without defendants' receiving a three-year employment contract. It was obvious to defendants that there was no hope that they would prevail in the litigation. There was no guarantee that, absent the lawsuit, any defendant would have been reelected anyway. However, the voting rights suit guaranteed that defendants' positions would cease to exist. We can see no way to construe the lawful authority of the former Danville city commissioners to include the preservation of their jobs when the existing governmental structure violated the civil rights of the city's citizens and the citizenry could not have returned defendants to their offices in an election because the commission form of government would cease to exist. Of course, defendants instead could have run for mayor or alderman in the new city government.

This does not mean, however, that the terms of the settlement are improper. Defendants' concern for some sort of transitional government was legitimate. We only object to defendants' methods and the ultimate personal reward they gleaned from the establishment of that transition government. The appellate court stated that it could not conceive of any way that defendants could have removed themselves from the negotiation process. (193 Ill. App. 3d at 293.) On the contrary, we determine that if the three statutes involved in this case are read in conjunction with each other, the prohibition against

"making or letting" in section 3(a) and the "directly or indirectly" language of both sections 3(a) and 3—14—4(a) helps define the limits of defendants' "lawful authority" in negotiating this type of settlement. This language implies a "hands off" approach to the type of settlement negotiations that occurred here. To effectuate the statutory purpose of keeping the loyalties of public officials to their public trust undivided, the defendants should not have been involved in the negotiation process at all. It would be improper, if not impossible, for us to define the guidelines to which defendants should have limited themselves in obtaining a settlement which would have afforded the kind of transition period that Danville's government required. We note that Federal courts have entered consent decrees in settling these types of lawsuits while suggesting that the public officials who are parties need not be involved. (See *Derrickson v. City of Danville* (7th Cir. 1988), 845 F.2d 715, 723 (defendants in case at bar could have "removed themselves from the process of negotiation [and] there would have been no serious question about either process or substance"); *Overton v. City of Austin* (5th Cir. 1984), 748 F.2d 941, 945-47 (terms of interim order and consent decree in voting rights case called for court to enact its own plan should parties fail to agree).) We hold that defendants' direct involvement and control of the settlement negotiations and the eventual terms of the consent decree clearly went beyond the limits of defendants' lawful authority as defined in section 33—3.

We also disagree with the appellate court's determination that a "mixed-interest" situation will not trigger the prohibitions contained in these statutes. We find no indication in the language of the statutes that indicates that an "incidental personal benefit" is permissible, except in section 3—14—4. Sections 3—14—4(b), (c), and (d) narrowly define the specific types of personal interests a

public official can have in a municipal contract, and the procedures the official must follow to avoid the criminal sanctions of the statute. (See Ill. Rev. Stat. 1989, ch. 24, pars. 3—14—4(b), (c), (d).) These exceptions to section 3—14—4(a)'s prohibition against self-dealing allow public officials who are also business persons to transact business with the municipality they work for. This clearly is not the case for defendants.

We also find that the appellate court's use of a "mixed-interest" interpretation violates the legislative intent of these enactments. First, almost every example of official conduct could be classified as a "mixed-interest" case. The craftiest of corrupt politicians are experts at making their self-dealing appear to be in the best interests of their constituents. To allow instances of self-dealing to go unpunished merely because the benefit the public official receives is "incidental" or because the municipality receives the lion's share of the benefit would effectively prohibit the State from prosecuting all but the most egregious cases of official misconduct. These statutes are rarely or ineffectively used to battle official corruption now. (See generally Spak & Parenti, *Conflict of Interest: A Totally Ignored Illinois Criminal Sanction Against Corruption in Government*, 52 Chi-Kent L. Rev. 64 (1976); Comment, *Illinois Conflict of Interest Law and Municipal Officers*, 12 S. Ill. U.L.J. 571 (1988).) We will not embrace an interpretation which will further inhibit their use and frustrate the legislative intent to enact "sweeping prohibitions."

We also note that a conviction under section 33—3 of the Criminal Code of 1961 requires only that the accused have an intent to obtain a personal advantage for himself or another. (*People v. Sims* (1982), 108 Ill. App. 3d 648, 651.) Knowledge that the action in question violates the statute by being outside the officer's lawful authority is not an element. (*People v. Kleffman* (1980), 90 Ill.

App. 3d 1, 3.) The crime in these cases is not that a public official intends to exceed the official's authority, but that in seeking personal gain the official's public duty and personal interest are intertwined. Public officials in this situation cannot perform official duties without effecting their personal interests. There can be no "severing" of the two. (See 193 Ill. App. 3d at 293.) This is the essence of what the appellate court defines as a mixed-interest case. We hold that the statutes under which defendants were convicted were enacted to discourage this type of ethical dilemma and the abuses that stem from it. See *Miller*, 79 Ill. 2d at 490 (these provisions aimed at both bad-faith abuse of power and creation of relationships which carry potential abuse).

Parenthetically, we must disagree with the appellate court's characterization of the terms of the consent decree as affording defendants an "incidental" benefit. Defendants were faced with unemployment. An agreement which guaranteed them a three-year extension of their positions while giving them the power to set and fix their own salaries for four years is anything but "incidental" in light of this.

We also parenthetically note that the evidence of the municipal ordinance that defendants passed soon after the consent decree was entered only serves to support the contention that defendants acted outside the limits of their authority. We find it odd that defendants found it necessary to enact an ordinance which indemnified Danville city officials for criminal acts performed while acting in the best interests of the city. This implies that, prior to this ordinance, Danville officials who violated a criminal statute while acting on the city's behalf in good faith would have been acting *outside* of their official capacity. While not dispositive, this evidence serves to further impugn defendants' actions in negotiating the terms of the consent decree.

We also cannot agree with defendants' contentions that the proper procedure the State should have followed was to file an appeal which objected to the terms of the settlement agreement. We find that the reasoning articulated by the Court of Appeals for the Seventh Circuit in its opinion dealing with this case is persuasive. When the Federal district court entered the consent decree, it entered a permanent injunction barring the State's Attorney from prosecuting defendants. The district judge reasoned that because the consent decree did not, in his opinion, violate State law, the State's Attorney could not relitigate these matters in the guise of a criminal proceeding. *Derrickson*, 845 F.2d at 716-17.

The Court of Appeals reversed. The court reasoned that the State, as represented by the State's Attorney, could be bound by the Federal district court's ruling only if the State's Attorney had to raise an issue before the district court but failed to do so (thus barring subsequent prosecution by claim preclusion or *res judicata*), or because the district court actually decided the central issue in the criminal prosecution (thus barring the criminal proceeding by issue preclusion or collateral estoppel). The court determined that *res judicata* did not apply, for several reasons: the State's Attorney did not need to raise his claim under the Federal Rules of Civil Procedure; the Federal district court lacked jurisdiction to hear a State criminal case; the criminal prosecution did not grow out of the same transaction or occurrence as the civil claim before the district court; and a government employee's lack of authority to bind a municipality may be raised later if overlooked in negotiating a settlement. *Derrickson*, 845 F.2d at 721.

As for collateral estoppel, the court reasoned that the State would be bound by the Federal district court's ruling only to the extent questions of authority were litigated and decided. The court explained that issue preclu-

sion applies only when a legal issue has been actually decided after a full and fair opportunity to litigate where the issue was necessary to the decision. (*Derrickson*, 845 F.2d at 721, citing *Parklane Hosiery Co. v. Shore* (1979), 439 U.S. 322, 58 L. Ed. 2d 552, 99 S. Ct. 645.) The court determined that the district judge had severely limited the State's Attorney's participation in the case (*Derrickson*, 845 F.2d at 721-23) and had decided only whether defendants, as the government of the City of Danville, had the power to enter into the decree; he did not decide whether defendants were the proper parties to negotiate on behalf of the city while also acting as jobseekers (*Derrickson*, 845 F.2d at 721, 723). The Court of Appeals therefore found no basis for the injunction, and allowed the State's Attorney to prosecute defendants.

We agree with this reasoning. The Federal district court never adjudicated the conflict-of-interest issues on the merits. (*Derrickson*, 845 F.2d at 723.) Therefore, there was no decision from which to appeal regarding the issue of defendants' having committed a crime. Also, as we have said, a consent decree is, in effect, a contract, which cannot be considered the judgment of the court. Absent fraud or some other defense to contractual formation, there is nothing the State's Attorney could have appealed from. (*Kandalepas*, 191 Ill. App. 3d at 54.) We conclude that the only avenue the State's Attorney had by which to pursue vindication of the public policy of the State as embodied in the conflict-of-interest statutes at issue in the case at bar was to prosecute defendants.

This explanation of the Seventh Circuit decision also refutes defendants' argument that they should have been allowed to rely on the Federal district court's statement that the consent decree did not violate State law. The district court's entry of the consent decree never dealt

with the substantive issues underlying defendants' eventual conviction. We also note that the crime of which defendants were eventually convicted occurred during the negotiation process, making irrelevant any after-the-fact statements by the district court judge. (See *Savaiano*, 66 Ill. 2d at 15 ("[t]he evil exists because the official is *able to influence the process of forming a contract*" (emphasis added)).) We have already explained that all that was necessary for a conviction in this case was proof that defendants acted outside their lawful authority with intent to gain a personal advantage. Because the acts for which defendants were convicted occurred before the Federal district court entered the consent decree, any reliance by defendants to statements made by the district judge was illusory.

Finally, the defendants cannot rely on the doctrine of legislative immunity to protect them from prosecution. This issue was never raised by defendants prior to their appeal; therefore, the issue is waived. (*People v. Dale* (1986), 112 Ill. 2d 460, 467 (nonjurisdictional questions not properly presented to trial court are not considered on appeal).) Even if the issue had been preserved for review, however, defendants would not prevail. If courts are not allowed to inquire into the negotiation process of public officials engaged in their official legislative duties, the State could never prosecute public officials under the statutes which prohibit self-dealing. While defendants may have been immune from civil liability under the doctrine of legislative privilege, we cannot allow them to conceal their criminal violations and escape punishment merely because they committed their crimes while performing legislative duties. *United States v. Gillock* (1980), 445 U.S. 360, 372-73, 63 L. Ed. 2d 454, 464-65, 100 S. Ct. 1185, 1193-94.

For the foregoing reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE MILLER took no part in the consideration or decision of this opinion.