**Jerome Edward SPECKELS, Plaintiff and Appellant,**

v.

**Gerald M. BALDWIN, Individually, Edward A. Himrich, Individually, and Home Corporation, Defendants and Appellees,**

**and**

**City of Custer City, a municipal corporation, Annella Wright, in her capacity as Mayor of the City of Custer City, State of South Dakota, in their official capacity as Members of the Common Council for the City of Custer City: Rob Schilling, Roger Behlings, Kevin Jenniges, Sam Boettcher, Blaine Foss, and Lee Sutton, Defendants.**

No. 17987.

Supreme Court of South Dakota.

Considered on Briefs March 16, 1993.

Reassigned Nov. 16, 1993.

Decided Feb. 16, 1994.

Rehearing Denied March 29, 1994.

Wayne F. Gilbert of Johnson Huffman, Rapid City, Timothy J. Vander Heide of Bakewell, Hauge & Vander Heide Custer, Ronald W. Banks of Banks, Johnson & Colbath, Rapid City, for plaintiff and appellant.

Edward D. Carpenter of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for defendants and appellees Baldwin, Himrich and Home Corp.

HENDERSON, Justice (on reassignment).

*PROCEDURAL HISTORY/ISSUES*

Taxpayer Jerome Speckels sought to declare null and void a lease-purchase agreement between the City of Custer City (City) and Homes, Inc., a for-profit corporation which included the Custer City Attorney, Gerald Baldwin, as one of its principals. Following trial on January 3, 1992, Findings of Fact and Conclusions of Law were entered by the trial court upholding the contract. On appeal, we consider the following issues:

I. Does SDCL 6–1–1 apply to the lease-purchase agreement herein?

II. Does SDCL 6–1–1 apply to Baldwin?

III. Does the lease-purchase agreement violate public policy?

IV. Is this action barred by the statute of limitations?

Whereas this transaction was subject to the mandates of SDCL 6–1–1 and is violative of public policy, we reverse and remand.

*FACTS*

In an effort to place a nursing home in the Custer community, on August 5, 1963, the City of Custer conveyed a parcel of land, Lot E, to Custer Manor, Inc. (a non-profit corporation comprised of several local business people) for its appraised value of $20,000. Not so coincidentally, City appropriated out of its general funds the same amount to Custer Manor as a donation.

Baldwin moved to Custer in 1965 and began practicing law. The following year, he was appointed Custer City Attorney. In March, 1967, Baldwin and co-defendant Edward A. Himrich, along with others, formed Homes, Inc. (a/k/a Home Corporation), a for-profit entity. Within five days of its inception, Homes, Inc. had met with Custer's Common Council seeking a bond issue to finance the nursing home's construction. Baldwin, as city attorney, drafted the ordinance calling for a public vote on the question. Although the bonds were approved by voters in May, 1967, the bonds never sold.

In March of 1969, Custer Manor executed a warranty deed granting Lot E to Homes, Inc., however, the deed was not recorded. At a Common Council meeting in September, 1970, Himrich, a member of the city planning commission from October 7, 1968 through 1972, proposed new plans to build a nursing home for the community. Although the minutes of the meeting reflect that Himrich was representing Custer Manor, Baldwin, who served as city attorney during this meeting, testified that the minutes were incorrect because Himrich was actually representing Homes, Inc. On October 21, 1970, another bond election was held and passed. The following day, Baldwin recorded the warranty deed obtained from Custer Manor back in March of 1969.

After approval by the Common Council, City executed a lease-purchase agreement with Homes, Inc. conveying Lot E to City, which in turn leased it to Homes, Inc. for twenty years. After expiration of the twenty years, Homes, Inc. would have the option of extending the lease for two consecutive ten-year terms or purchase the land for one dollar ($1.00). That same day, Homes, Inc. sublet the property to CM Corporation (CM). Lease payments would be used for retiring the revenue bonds. Because City was the recorded fee owner, the interest on the bonds was free from federal taxes. CM operated the nursing home as subtenant of Home, Inc. which paid taxes on the monthly rent payments as ordinary income. Baldwin was ac-

tive in the management of the nursing home since its opening.

By September, 1986, all revenue bonds had been retired. Per the lease agreement, all future rent payments made by CM, thereafter, were remitted directly to Baldwin and Himrich, the only remaining investors in Homes, Inc. whose corporate status had since lapsed.

Two months shy of the expiration of the lease-purchase, Speckels, a citizen of Custer, filed this action seeking to (1) void the agreement between Homes, Inc. and City, (2) have the monthly lease payments from October, 1986 forward paid to City, and (3) recover attorney fees.

### DECISION

#### I. *SDCL 6–1–1 applies to this agreement.*

■ Under SDCL 6–1–1,* it is unlawful for a city officer to have a personal interest in a contract wherein the city purchases real estate. Trial court relied upon expert testimony and held that this statute is not applicable ·because City's lease-purchase agreement was merely a legal mechanism by which the city acted as a conduit for a tax-exempt investment to facilitate construction of a nursing home with revenue bonds and does not constitute the purchase of public property. While it is within the broad discretion of the trial court to accept expert testimony, *Stormo v. Strong*, 469 N.W.2d 816 (S.D.1991), this finding is clearly erroneous as a matter of law. *Permann v. Dept. of Labor*, 411 N.W.2d 113 (S.D.1987). It is contrary to a prior decision of this Court concerning the same piece of real estate. *Petition of CM Corp.*, 334 N.W.2d 675 (S.D. 1983). Therein, a unanimous court, cognizant of the lease-purchase agreement, noted, "Under the stipulation of facts ... the City

of Custer is the owner of the nursing home property." *CM Corp.*, 334 N.W.2d at 677. We are bound by that holding, and so is the trial court.

City claims the purchase of the property was· in name only; however, it was a purchase of real property by city officers nonetheless. By failing to apply SDCL 6–1–1 to this transaction, we are definitely and firmly convinced that a mistake has been made by the trial court. *Chamberlain Livestock Auction v. Penner*, 462 N.W.2d 479, 482 (S.D. 1990).

#### II. *Baldwin acted as a city officer.*

■ In 1966, Baldwin was appointed city attorney for Custer—a municipal officer under SDCL 9–14–1—and received a $100 per month retainer until 1971, just prior to the city's lease-purchase agreement with Homes, Inc., a corporation which Baldwin essentially controlled.

Aware of the potential conflict of interest, Baldwin asked not to be sworn in as city attorney in 1970. Nevertheless, he continued to perform city attorney duties, compensated at an hourly rate. As established in the minutes published by the Common Council, Baldwin acted in the capacity of city attorney at all times relevant to this cause of action. Although other attorneys purportedly handled the various aspects of the bond election and related transactions, Baldwin, the only city attorney of record, drafted, and at city meetings read aloud, legal documents and ordinances pertaining to this transaction between Custer and his corporation. He acted as a city officer per SDCL 9–14–1, thus subjecting the transaction to SDCL 6–1–1.

■ Local government officers and employees are not to be interested, directly or indirectly, in any contract of their govern-

---

* SDCL 6–1–1 states:

 *It shall be unlawful for any officer of a* county, municipality, *township or school district, who has been elected or appointed, to be interested,* either by himself or agent, *in any contract entered into by said* county, municipality, township or school district, either for labor or services to be rendered, or for the purchase of commodities, materials, supplies, or equipment of any kind, *the expense, price or consideration of which is paid from public funds or*

*from any assessment levied by said* county, municipality, township or school district, *or in the purchase of any real* or personal *property belonging to the* county, municipality, township or school district or which shall be sold for taxes or assessments or by virtue of legal process at the suit of such county, municipality, township or school district. *Such contract shall be null and void from the beginning.* (Emphasis supplied.)

ment. *McGhee v. Glenn,* 244 Ark. 1000, 428 S.W.2d 258 (1968); *Millbrae Ass'n v. City of Millbrae,* 262 Cal.App.2d 222, 69 Cal.Rptr. 251 (1968). As stated in the first issue, it is unlawful for a city officer to have an interest in a contract wherein the city purchases real estate. SDCL 6–1–1. Baldwin's work on the bond election proposal, which inured to his personal benefit, highlights the very conflicts which SDCL 6–1–1 was enacted to prevent. *See also Dodaro v. Commonwealth, State Ethics Comm'n,* 527 Pa. 539, 594 A.2d 652 (1991); *People v. Scharlau,* 141 Ill.2d 180, 152 Ill.Dec. 401, 565 N.E.2d 1319 (1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1991); *Place v. Bd. of Adjust. of Saddle River,* 42 N.J. 324, 200 A.2d 601 (1964). This constituted a conflict of interest, and Baldwin knew it. The City of Custer knew it. However, both attempted to side-step the conflict by appointing and retaining Baldwin, yet skipping the administering of his oath of office as required by SDCL 9–14–6. We scrutinize these facts with great care and condemn those actions which indicate corruption or favoritism in a public office. *Van Itallie v. Borough of Franklin Lakes,* 28 N.J. 258, 146 A.2d 111 (1958); 2A Antieau's Local Government Law § 22.62 (rev. ed. 1992). In light of these proceedings, the City of Custer's deliberate failure to administer the oath of office to Baldwin gives credence to such an indication.

In fact, Baldwin testified he was "an employee doing legal work of the City;" yet he countered, "I do not believe that I was an officer of the City as City Attorney may be." It is impossible to stand up in a meeting, prepare an ordinance as city attorney, read a resolution as city attorney, be paid as city attorney, and then deny that you are the city attorney. Now, using parol evidence, both Baldwin and the City have attempted to contradict, deny, and supplement the very documents and minutes on file at city hall. This cannot be done. *Lewis v. Bd. of Educ. of Johnson County,* 348 S.W.2d 921 (Ky.App. 1961); 5 McQuillin Mun. Corp. § 14.07 (rev. 3d ed. 1989).

 Local government officers and employees have a duty to serve their government and the people, uninfluenced by ad-

verse motives and interests. *State v. Weleck,* 10 N.J. 355, 91 A.2d 751 (1952). "Such required conduct demands undivided loyalty and compels public officers to refrain from outside activities which interfere with proper discharge of their duties, or which may expose them to the temptation of acting in any manner other than in the best interests of the public." 2A Antieau's Local Government Law § 22.59 (rev. ed. 1992). New Jersey has held that these principles were violated when a municipal engineer did engineering work for a developer when he knew, or should have known, that it would be used by the developer in connection with a city project which he represented. His conflict was that he would be required to pass judgment on his own work. *Newton v. Demas,* 107 N.J.Super. 346, 258 A.2d 376 (App.1969). The same holds true for Baldwin.

When the mayor of Ralston, Nebraska was a shareholder in a corporation involved in a real property sale with the city, a city resident alleged conflict of interest. The Nebraska Supreme Court disagreed on grounds that the mayor had agreed to leave any city council meeting and did not take part whenever the sale of the land was discussed. *Abboud v. Lakeview, Inc.,* 237 Neb. 326, 466 N.W.2d 442 (1991). Conversely, though other attorneys may have had involvement with this project, Baldwin never isolated himself from the transaction or its discussion. The Nebraska mayor did not take part but Baldwin did. As an attorney, he knew to avoid even the appearance of impropriety. *See* Canon 9 (a lawyer should avoid even the appearance of professional impropriety).

III. *Public policy is undermined by this transaction.*

 Without question, this conflict of interest violates South Dakota public policy for it amounts to building a facility financed in a contract between a municipality and one of its officers. In fact, it appears that the City of Custer has failed to receive revenues from lease payments since 1986. This amounts to nearly $700,000 which Attorney Gerald Baldwin and Edward Himrich, two of the defendants herein, have unlawfully received and unlawfully appropriated. Public

policy requires that local government officials cannot be permitted to place themselves in a position in which personal interest may conflict with public duty. *Sciuto v. City of Lawrence*, 389 Mass. 939, 452 N.E.2d 1148 (1983); *Josephson v. Planning Board*, 151 Conn. 489, 199 A.2d 690 (1964). "It is the policy of the law to keep the official so far from temptation as to ensure his unselfish devotion to the public interest." *Tuxedo Conservation & Taxpayers Ass'n v. Town Bd.*, 69 A.D.2d 320, 418 N.Y.S.2d 638, 640 (1979) (quoting *Mills v. Town Plan and Zoning Comm'n*, 144 Conn. 493, 134 A.2d 250, 253 (Conn.1957)).

■ "It is fundamental law that an attorney must not while representing a client do anything knowingly that is inconsistent with the terms of his employment or contrary to the best interests of his client." *City of Hastings v. Jerry Spady*, 212 Neb. 137, 322 N.W.2d 369, 372 (1982). Since the revenue bonds were retired, the annual lease payments made by the subtenant to Baldwin (and Himrich) have deprived his client of approximately $700,000 so far, contrary to the best interests of the people of the City of Custer. An attorney is, by virtue of his office, disqualified from representing interests which are adverse in the sense that they are in conflict with each other. *City of Hastings*, 322 N.W.2d at 372; 7A C.J.S. *Attorney & Client* § 150 (1980). It is a violation of the fiduciary duty of a local government officer to use his position in any way for private gain. *State v. McKelvey*, 12 Ohio St.2d 92, 232 N.E.2d 391 (1967). We will not permit a conflict of interest to be disregarded merely because Baldwin bypassed his oath of office.

■ These dealings cannot be condoned by this Court. Here, the citizens of Custer, through its city officials, gave land to a nonprofit corporation to construct a nursing home. SDCL 47–26–30 does not permit a non-profit organization to dispose of its assets to a corporation organized for profit. By maneuvering within the confines of municipal government, the land all became the property of an entity existing for profit, a corporation co-owned by city attorney Gerald Baldwin and city planning commissioner Edward Himrich.

■ Even if the contract, under a public policy argument advanced by Baldwin and Himrich, were advantageous to the City, such a thesis is of no consequence. *Norbeck and Nicholson Co. v. State*, 32 S.D. 189, 142 N.W. 847 (1913). The wrong lies in the creation of a situation tending to weaken public confidence in the integrity of the public service, and to undermine the sense of security of individual rights, which the citizen and property owner must feel assured will always exist in the exercise of public authority. *Dodaro*, 594 A.2d at 653–54; *Katz v. Brandon*, 156 Conn. 521, 245 A.2d 579, 587 (1968). Rather, this Court has taken the position that the conflict of interest, reflected by this scenario, is inherently bad for the people of this state.

IV. *Statute of limitations issue not properly raised.*

City and Home allege that Speckels' claim is barred by the statute of limitations; however, City and Home failed to file a notice of review pursuant to SDCL 15–26A–22, thus precluding it from being raised on appeal. *A.L.S. Properties, Silver Glen v. Graen*, 465 N.W.2d 783, 787 (S.D.1991).

Reversed and remanded.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

AMUNDSON, J., dissents.

AMUNDSON, Justice (dissenting).

The transaction in this case must be reviewed to determine whether it runs afoul of SDCL 6–1–1. This transaction involves revenue bonds issued pursuant to SDCL ch. 9–54. The legislature has stated that municipalities shall be entitled to issue these types of bonds to develop and stimulate general economic prosperity in the community. SDCL 9–54–1, 9–54–2. Further, when undertaking a bond issuance for such purposes, the statutes authorize revenue agreements providing for the lease and sale of the projects funded by the bonds. SDCL 9–54–8. The transaction is to be tailored so that the bonds are not a general obligation of the municipality and will be retired by revenues

received from the bonded project. SDCL 9–54–6.

In this case, City issued bonds for the construction of a nursing home. The bond issuance was placed before the City voters. After the election, Home gratuitously conveyed Lot E to City in order to utilize the statutory authority for a lease-purchase agreement. This conveyance was necessary to convert the bonds to tax-exempt status. Pursuant to the terms of the lease-purchase agreement and SDCL 9–54–6, the bonds were retired by the revenues generated by the nursing home. These payments were given to City which then passed them on to the bondholders. City, by merely serving as a conduit for the repayment of the bonds, assisted in stimulating the construction of the nursing home without incurring any liability on the bonds.

No court has held that a lease-purchase agreement, such as this one, used in conjunction with revenue bonds constitutes the purchase of public property. In reaching its decision, the trial court considered evidence presented by Ray Woodsend (Woodsend), an expert in tax-exempt financing. As expert Woodsend testified at trial:

A. Industrial development bonds started in the late '30's in Missouri and there was no particular provision in the Federal Tax Code or anything dealing with those. Missouri started *the process of having property transferred to the city's name and then the city issuing bonds and when the bonds were paid off, then they were put back to the owner so that they technically were in the same name of the city for a tax exempt entity. All of the bonds were initially done throughout the country as a lease-purchase for that reason because there was a presumption that as long as the city held title that they'd be exempt for federal income tax.* In the early to mid '60's the federal government started to get into developing regulations and going through the tax code making provisions to tax exempt finances as related to industrial development bonds and those in a generic sense include the bonds like the ones that were issued in the City of Custer. (Emphasis supplied.)

City merely served as the mechanism through which the bond repayment flowed from Home to the holders of the bonds. Woodsend testified:

Q. On the revenue bond issue, where does the money come from?

A. The money on an industrial development, when you have a lease-purchase, the lease is the city's obligation typically through a trustee and it is the city's obligation to get the money from the lessee because *the city is then the lessor of that facility and their obligation is whatever money they receive under the lease, to pass that onto the holders of the bonds. They are just a conduit.* (Emphasis supplied.)

A trial court may, in its discretion, permit expert testimony to assist it with difficult questions of law. *In re Estate of Jones,* 370 N.W.2d 201, 204 (S.D.1985). Further, a trial court, when also sitting as the fact finder, is the sole judge of the credibility of the witnesses and can accept or reject all or part of the experts testimony. *Lawton v. McCauley,* 460 N.W.2d 728 (S.D.1990). The trial court obviously concluded that Woodsend's testimony was credible.

Moreover, the lease-purchase agreement provided that any payments made after the bond's retirement would be given to Home.* When the lease term expired, Home could reacquire the property which it gratuitously conveyed to City when this transaction was originally structured for tax-exempt status for one dollar ($1.00). Accordingly, the lease-purchase was merely a mechanism "to develop and stimulate [City's] general economic welfare" by constructing this project.

At first blush, the fact that Baldwin was part-time city attorney when this transaction was negotiated and executed seems to present an odoriferous situation. However, after reviewing the statutes and the transaction, it

---

* City was represented by attorney Martin Farrell during the negotiations and finalization of the lease-purchase agreement.

is clear that this transaction was not a purchase of real property belonging to a municipality. The real property involved in this transaction was placed in City's name only to employ the benefits of SDCL 9–54–8 and is the type of transaction authorized by the legislature.

Speckels also erroneously argues that the lease-purchase agreement for the construction of the nursing home violates public policy. Speckels contends that public policy has been violated because Baldwin, the part-time city attorney, has profited from his involvement in building and successfully operating the nursing home.

Under the doctrine of public policy, a court may refuse to enforce contracts that violate public law or public policy. *United Paperworkers Int'l Union, AFL–CIO v. Misco,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286, 301 (1987). Speckels asserts that public policy was violated when Home was allowed to keep rents collected after retirement of the bond. However, City had no interest in these rents other than passing them along to the bondholders in order to retire the bond. City's involvement was unnecessary once the bonds were retired. Furthermore, Home received no compensation for its services and investment in the construction, and operation of the nursing home until the bonds were retired.

I totally agree with the trial court's analysis on this aspect of the case:

Building a nursing home upholds a valid public interest: housing and care for the aged. Government entities have long supported these projects in South Dakota and throughout the United States. Likewise, revenue bonds, lease-purchase agreements, and other devices all represent valid means toward creating and financing such facilities. Plaintiff alleges that Baldwin's and Himrich's positions with Custer City make their involvement with the Lease–Purchase Agreement indefensible. Yet their positions gave them no inside advantage. Custer City has lost nothing and Baldwin and Himrich have not profited through their positions. After carefully examining the record and separating fact from allegation, considering that the burden of proof is on Plaintiff, I find no conduct to justify nullifying the Lease–Purchase Agreement nor see how the agreement offends the public's interests.

It is beyond dispute that Baldwin was acting as part-time city attorney for Custer during the time the bond issues were submitted for a vote. While Baldwin did some clerical functions in regard to the nursing home matter, he did not render any legal services to the City on the matter. City retained independent bond counsel and independent counsel to represent it in the negotiations of the lease-purchase agreement. It is difficult to discern how Baldwin would fall within the definition of an officer of the city in this case.

In *Seymour v. Western Dakota Vocational Technical Inst.,* 419 N.W.2d 206, 208 (S.D. 1988) (citing *Griggs v. Harding County,* 68 S.D. 429, 431, 3 N.W.2d 485, 487 (1942)), this court defined "public officer" as coming within the ambit of SDCL 6–1–1:

It may be stated, as a general rule deducible from the cases discussing the question, that a position is a public office when it is created by law, *with duties cast on the incumbent which involve an exercise of some sovereign power* and in the performance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent, while a public employment, on the other hand, is a position which lacks one or more of the foregoing elements. (Emphasis supplied.)

What sovereign power was vested in Baldwin in deciding whether the bonds should be issued or the lease-purchase agreement approved and executed? The answer is none. The exercise of these executive functions was solely vested in the city council and not Baldwin as part-time city attorney. Therefore, I would hold that Baldwin was not a public officer covered by SDCL 6–1–1.

From the beginning, the record clearly shows City did not want to be involved in the ownership or operation of the nursing home because as it was experiencing difficulties in the ownership and operation of the city hospital. Now, twenty-plus years later, City will

own this nursing home after two entrepreneurs under the free enterprise system (which I assume had always been a precept upon which this nation was founded) made it a successful business entity while serving the Custer community and surrounding area. I cannot be a part of such a harsh decision which, in essence, penalizes parties for having the guts to be risk takers. City was never at risk in this matter and the taxpayers have not been taken advantage of. This nursing home was constructed through the use of revenue bonds as authorized by our legislature.

I would affirm the decision of the trial court.