FRED ABBOUD, INDIVIDUALLY AND ON BEHALF OF OTHERS
SIMILARLY SITUATED, APPELLANT, V. LAKEVIEW, INC., A NEBRASKA
CORPORATION, AND CITY OF RALSTON, NEBRASKA, A MUNICIPAL
CORPORATION, APPELLEES.
466 N.W.2d 442

Filed March 1, 1991.    No. 88-903.

Chris Abboud for appellant.

Steven J. Riekes, of Richards, Riekes, Brown & Zabin, P.C., for appellee Lakeview, Inc.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is the second appearance of this case before this court. Abboud's original action was for declaratory and injunctive relief against the defendants-appellees, Lakeview, Inc., and the City of Ralston (City). Abboud prayed for a permanent injunction prohibiting the sale of real property from the City to Lakeview, for a permanent injunction preventing the City from selling or using the property for anything other than a park, and for a finding that a 1967 lease between the City and Lakeview was void. The district court sustained the defendants-appellees' demurrer, and Abboud appealed to this court. This court reversed and remanded the action for further proceedings. See *Abboud v. Lakeview, Inc.*, 223 Neb. 568, 391 N.W.2d 575 (1986). On remand the district court denied Abboud relief, and this appeal followed.

This action concerns real property, commonly referred to as the "Seymour Lakebed," on which Lakeview, under a lease with the City, built and maintained a golf course. The City subsequently sold the land to Lakeview under a purchase option in the lease. It is this sale that Abboud seeks to enjoin. Lakeview also leased and later purchased under the lease option an adjoining piece of property that was not part of the lakebed property we are concerned with in this action. The golf course is

built on both pieces of property. The boundaries of each piece of property are depicted in the diagram below. Abboud is a resident and former city councilman of Ralston. He also owns property located directly across the street from the golf course. This court has already decided that Abboud has standing to bring suit against the City. See *Abboud, supra*.

On May 8, 1937, the Cudahy Packing Company, for consideration, conveyed by warranty deed to the City (then a village) the lakebed property. The grant of the property was in the form of a fee simple subject to condition subsequent. The land, by the terms of the deed, was restricted to park or public recreation area use and subject to a right of reentry by the grantor in the event the property was ever used for a different purpose. Cudahy Packing thus held a future interest called a right of reentry. On October 27, 1944, Cudahy sold this interest (consisting of the right of reentry) to Mr. and Mrs. Fred Eipperle. On April 1, 1947, the voters of the City authorized the board of trustees to issue a general obligation bond in the amount of $5,000 to purchase the right of reentry from the Eipperles. The minutes of the Ralston City Council dated February 4, 1947, refer to the bond issue as "Park Bonds for purchasing land for park purposes." The minutes also state that the purpose for obtaining the Eipperles' interest was so that a dry lake on the property could be revived. Additionally, the minutes note that Fred Eipperle had been attempting for several months to cause the land to revert back to him, leaving the City without any interest in the land. The City subsequently obtained the Eipperles' title to the land by quitclaim deed. Because the City then owned both the present possessory and future interests, under the doctrine of merger the two estates became a fee simple absolute. See *Abboud, supra*. Therefore, the restriction in the deed from Cudahy Packing no longer existed, and the City owned the land in fee simple free of restriction. *Id*.

The testimony is conflicting as to the uses made of the lakebed property prior to construction of the golf course. Eldon Murray, the City's maintenance superintendent for 18 years and a resident of Ralston since 1949, testified that the property was not a park and was not treated as a park during that period. He stated that much of the property was marshy and full of mosquitoes and rodents. Murray testified that during his years as the maintenance superintendent there were no bathroom facilities, water fountains, improved trails, picnic tables, or flowers present on the property. A former mayor of Ralston, Wendell Kronberg, testified that the property was

abandoned, was used as a dump by residents of Ralston, and was an "eyesore." According to the May 20, 1952, city council minutes, the councilmen voted to permit Don Fucinaro to raise corn on the lakebed.

In support of his contention that the property was used as a park, Fred Abboud testified that his sons played football in the area and that he observed the area being used for fishing, hiking, and camping. Fern Taylor, a longtime resident of Ralston, testified that children ice-skated on the lakebed when there was water in it and that men trained hunting dogs in the area. Hugh Hamilton, a former city councilman and resident of Ralston, testified that in the 1950's water was pumped from Big Papillion Creek into the lakebed and that children swam and people fished there when the lake was full. He also testified as to the existence of a clubhouse on the property that was later torn down.

There is evidence in the record that the City did expend a small amount of money on the property prior to 1967. Murray, the maintenance superintendent, testified that his department mowed parts of the property when it was able to and that the area was sprayed for mosquitoes. The city council minutes during the years 1948 and 1949 mention plans for the installation of pumping equipment for the lake, which at that time contained water. The minutes also mentioned rental of the clubhouse to various organizations. There is no evidence in the record, however, that the City ever attempted to permanently revive the lake or develop the property into a park. Pictures of the property taken prior to the development of the golf course depict the land as overgrown and left primarily in its natural state. The City did not formally dedicate the land as a park or improve the land with the usual park amenities such as parking, landscaping, or bathroom facilities. The land remained in an undeveloped state until 1967, when the City entered into the lease with Lakeview.

Prior to and after entering into the lease of the property with Lakeview, the City sold three portions of the lakebed property to private parties: the first to William Dodson in June 1957, the second to W.C. Foxley in February 1965, and the third to the American Legion in July 1984. The boundaries of these parcels

are depicted in the diagram. Fred Abboud was a member of the city council and voted in favor of the sale to Foxley in 1965.

In 1963, a member of the city council suggested that the lakebed property be used to build a golf course. The council then began to actively seek bids from private developers interested in building and operating a golf course on the property. In 1967, the City leased the lakebed property, as well as an adjoining piece of property, to Lakeview after an earlier lessee, Miller, failed to develop the land as required in his lease agreement. The City-Lakeview lease specified that Lakeview was to develop and maintain the property as a golf course. The term of the lease was for 25 years, with an option to renew. The lease also contained a "right of first refusal." If Omaha ever annexed Ralston or the Ralston City Council ever decided to sell the property, Lakeview had the first right to purchase the land for $90,000. The rental price of the property was set at a fixed price for a term of years plus a percentage of the gross profits. The lease permitted Lakeview to charge any fees it wished for use of the golf course. The lease also provided that Lakeview had sole possession and responsibility for maintenance of the premises. The lease did give the City the right to inspect the premises, but there is no evidence in the record that the City ever exercised this right. Lakeview built and continued to operate the golf course for the next 16 years, paying to the City the agreed-upon rental.

In 1984, the Ralston City Council decided that it was in the City's best interest to sell the land. The City notified Lakeview of its intent to sell, and Lakeview decided to exercise its option to purchase the property. On June 19, 1984, the city council passed ordinance No. 761, declaring the property surplus. On November 20, 1984, the council passed ordinance No. 765, directing the sale of the land to Lakeview. Joseph Wager, a former councilman and mayor of Ralston, testified that the city council intended to use the proceeds from the sale of the golf course land to build a storage facility for the City's maintenance equipment.

On November 5, 1984, Abboud filed his petition in the Douglas County District Court, seeking to enjoin the sale. Pursuant to Neb. Rev. Stat. § 16-202 (Reissue 1987), on

December 20, 1984, Abboud filed a petition in remonstrance opposing the sale of the property. On January 8, 1985, the Ralston City Council confirmed the sale to Lakeview pursuant to ordinance No. 765, after determining, on the advice of the city attorney, that the remonstrance petitions failed to contain the number of signatures required by § 16-202. The election commissioner verified 836 signatures, 16 more than needed to comprise the 30 percent of registered voters required by § 16-202. Prior to the vote by the council, the city attorney recommended invalidating 55 signatures, leaving Abboud with less than the required number. The city attorney recommended that 29 signatures be considered invalid because they were obtained prior to the passage of ordinance No. 765 and that two petitions containing 26 signatures also be considered invalid because the petitions were circulated by an individual not registered to vote. Lakeview then purchased the lakebed property, as well as the adjoining piece of property it also leased from the City.

After the Douglas County District Court sustained the defendants-appellees' demurrer, Abboud, in his appeal to this court, assigned as error the district court's findings that he had no standing to sue, that the defendants-appellees did not violate the law when they failed to disclose a conflict of interest between City officials and Lakeview, and that the property was not held in public trust, so that the City was free to sell it.

As stated above, we determined that Abboud did have standing to sue. We never reached the question of whether a conflict of interest existed that would void the 1967 lease between Lakeview and the City pursuant to Neb. Rev. Stat. § 18-301.01(2) (Cum. Supp. 1984). We found that Abboud's claim that the lease was void was barred by the 1-year statute of limitations. His request for a permanent injunction barring the sale of the land was not similarly barred. We also held that under *Gallagher v. City of Omaha*, 189 Neb. 598, 204 N.W.2d 157 (1973), Abboud's petition stated a cause of action whereby the City may be limited in its rights to dispose of the lakebed property because it was purchased through a bond issue. Finally, we held that Abboud also stated a valid cause of action under § 16-202 through his filing of remonstrance petitions. We

then reversed judgment and remanded the cause to the district court for further proceedings on the "conflict of interest theory," the "bond issue theory," and the "remonstrance theory." See *Abboud v. Lakeview, Inc.*, 223 Neb. 568, 391 N.W.2d 575 (1986).

On remand, the district court found no conflict of interest between Gerald Koch, the mayor of Ralston at the time of the sale, and Lakeview, of which Koch was a 12½-percent shareholder. The court found that Koch was not the mayor of Ralston during the time the property was declared surplus by the city council and when the ordinance authorizing the selling of the property to Lakeview was passed, and that Koch had made every effort to comply with § 18-301.01 by disclosing his interest in Lakeview.

The district court also rejected Abboud's "bond issue" claim. The court cited the applicable passage from *Gallagher v. City of Omaha, supra* at 602-03, 204 N.W.2d at 160, where this court stated:

Where the park property has been acquired by the municipality especially for park use with funds from the sale of bonds specifically authorized by the electors for that purpose, the city is still a trustee of the property for such purpose, but in this case may divert the property from such use if it is clearly authorized to do so by the Legislature, at least where the property is no longer needed for park purposes.

The court stated that a city must meet two criteria in order to sell parkland purchased with bond funds. See *Gallagher, supra*. First, there must be a failure of park use or dedication as a park, and second, there must also be specific legislative authority authorizing the diversion of the land. *Id.* The court found that Neb. Rev. Stat. § 16-201 (Reissue 1987) conferred the needed legislative authority, in that § 16-201(3) gave each city of the first class the power to "sell and convey, exchange, or lease any real or personal property owned by the city, including park land . . . ." The court also found that the City authorized the sale when it declared the lakebed property surplus and decided to use the proceeds from the sale to build a storage facility for maintenance equipment. The court also determined that the

lakebed property was never regularly used as a park and was not formally dedicated as a park. Thus, the court found that the City complied with the rule in *Gallagher* and was authorized to sell the property to Lakeview.

Last, the court considered the "remonstrance theory" issue. Abboud contended that the remonstrance petitions contained the requisite number of signatures because § 16-202 required only that signers of the petitions be "electors," and there was no requirement that the "electors" be registered voters. The City and Lakeview contended that the findings of the Ralston City Council were conclusive and could not be attacked collaterally in this suit. Abboud's only remedy was through the filing of a petition in error. The court assumed that Abboud's amended petition was a petition in error and reviewed Abboud's contention de novo by making an examination of the relevant law and evidence. The court found "electors" to mean registered voters and denied Abboud relief under the "remonstrance theory."

Abboud claims the district court erred in finding the following: that property purchased with elector-approved bond funds for use as a park may be sold without legislative authorization other than § 16-201; that the lakebed property was never formally dedicated as a public park, thus restricting its disposition; that the lakebed property was abandoned as a park or that the trust was breached because of nonpark use; that the remonstrance petitions were signed by persons who were not legal electors; that the remonstrance petitions could not be signed prior to final passage of the ordinance authorizing the sale; and that Ralston Mayor Gerald Koch complied with § 18-301.01.

An action for injunction sounds in equity. *Federal Land Bank of Omaha v. Swanson*, 231 Neb. 868, 438 N.W.2d 765 (1989). In an appeal of an equity action, this court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Citizens*

*State Bank v. Jennings State Bank*, 236 Neb. 307, 461 N.W.2d 78 (1990). A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Federal Land Bank of Omaha, supra*. An injunction will not be issued unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Aro Inv. Co. v. City of Omaha*, 179 Neb. 569, 139 N.W.2d 349 (1966).

By this action Abboud seeks to have title to the lakebed property returned to the City. We will discuss the merits of his claim under the "bond issue" theory, the "conflict of interest" theory, and the "remonstrance" theory.

## THE BOND ISSUE THEORY

Generally, a municipality may not sell property held for public use without legislative authority. 10 E. McQuillin, The Law of Municipal Corporations § 28.37 (rev. 3d ed. 1990). Municipal corporations hold all property in which the public is interested, such as streets, wharves, parks, and public squares, in trust for the use of the public, and these properties may only be disposed of by the municipality if it is authorized to do so by statute. 10 E. McQuillin, *supra*, § 28.38. The statutory authorization functions as the terms of the trust. *Id*. Property which is not appropriated or devoted to a public use, property which has ceased to be used or is not used by the public, or land which is in excess of public need may be disposed of by a city without special statutory authorization. 10 E. McQuillin, *supra*, § 28.38.20.

A park is for the benefit of and is held in trust by a city for the public. 10 E. McQuillin, *supra*, § 28.52. When the parkland is dedicated or donated to a city under the condition that it be used only as a park, the city cannot divert the land to a use inconsistent with the purposes of the grant. *Id*. In Nebraska, the city is prohibited for all time from diverting parkland received by gift or dedication from a private party and restricted only to park use. See *Ash v. City of Omaha*, 152 Neb. 393, 41 N.W.2d 386 (1950). See, also, *Rayor v. City of Cheyenne*, 63 Wyo. 72, 178 P.2d 115 (1947) (land dedicated by the City of Cheyenne for park use and accepted and used by the public may not be

diverted to another use by the city unless specifically authorized to do so by the Legislature). Other states permit the city to divert use of the land if specifically authorized to do so by the legislature. *Pearlman v. Anderson*, 62 Misc. 2d 24, 307 N.Y.S.2d 1014 (1970).

In contrast, where parklands are held in fee simple by a city, the city has greater discretion in the sale or diversion of the land. Where the land is conveyed to the municipality free from restriction and afterward used for park purposes, the city may sell the land under its statutory power to sell any property owned by it, or it may devote the property to other public uses. 10 E. McQuillin, *supra*, § 28.52.05. See *Carson v. State*, 240 Iowa 1178, 38 N.W.2d 168 (1949) (where land is already publicly owned and is designated for some particular public use, no contractual trust arises in favor of the general public that precludes subsequent diversion of the land by proper legislative authority). Where the property is paid for by the city through the use of general funds, the intended use for the property may be changed as the needs of the city demand. *Carlson v. City of Fremont*, 180 Neb. 262, 142 N.W.2d 157 (1966).

In summary, if land is given to a city by a private party with a restriction on its use, the city must adhere to this use for all time, at least in Nebraska. This rule is based on the theory that a binding contract between the dedicator and the public arises at the time of the gift. See *Carson v. State, supra*. If the city purchases land or devotes land it already owns to a public use, then the city is free to divert the land to another public use or sell the land if authorized by the Legislature. *Id*. No contractual trust arises in favor of the public that prevents subsequent diversion of the land. *Id*.

Nebraska has adhered to the general principles of law governing the power of municipal corporations to sell land devoted to public use. In *Ash v. City of Omaha, supra*, this court restricted the power of a city to dispose of land received as a gift.

> Where dedication is made for a defined purpose, neither legislature, municipality, its successor, nor general public has any power to use property for any other purpose than one designated, whether use be public or

private, or whether dedication is a common-law or statutory dedication, notwithstanding that changed use may be advantageous to the public.

*Ash, supra* at 409, 41 N.W.2d at 396. This decision is consistent with the "dedicator-public contract" theory discussed above. In *Carlson v. City of Fremont, supra*, this court distinguished between land received by a city through an outright unrestricted grant or purchase and land received by gift or purchase conditioned for a specific use. We held that a city is free to divert the use of unrestricted land as the city determines, but land purchased or received by gift for a specific purpose is held in trust by the city for the benefit of the public. *Carlson, supra*. We determined that because the City of Fremont had purchased the land from the general fund and had not dedicated the land to any specific purpose, it was later free to divert the property to another use. *Id*.

This court has carved out a new exception to the powers of a municipality to dispose of parkland in *Gallagher v. City of Omaha*, 189 Neb. 598, 204 N.W.2d 157 (1973). The controversy concerning the City's right to sell the lakebed property centers on interpretation of this court's holding in *Gallagher*. In *Gallagher* the plaintiffs sued for declaratory and injunctive relief to prevent the City of Omaha and the Board of Regents of the University of Nebraska from entering into a "joint use agreement" whereby the university and the City of Omaha would jointly use a parking lot in Elmwood Park. The area where the parking lot was to be constructed had previously been for park use only. The park property subject to the agreement was purchased in 1892 with funds derived from a park bond issue for the purpose of enlarging Elmwood Park. The property has been continuously used for park purposes since that time.

This court held that park property acquired by a municipality through the sale of park bonds voted on by the electors is held in trust for the public by the city. The property may be diverted from park use only if the municipality is clearly authorized to do so by the Legislature and if the property is no longer needed for park purposes. Thus, the rule in *Gallagher* is composed of three parts. First, the land subject to the trust must be parkland purchased with bond funds voted on by the

electorate of the municipality. Second, the Legislature must have specifically authorized the municipality to divert the land from park use. Third, the property must no longer be needed for park purposes by the municipality. Under *Gallagher*, only when these three criteria are met can a city dispose of parkland purchased through a bond issue.

As discussed above, our holding in *Gallagher* does not eliminate a city's ability to sell dedicated parkland purchased with bond funds. Rather, it restricts a city's ability to sell the land only to the situation where the city has been specifically authorized to do so by statute and where the land is no longer needed by the city as parkland. Unlike the circumstance in which a city receives title to property by gift under a deed restricting its use to parkland, *Gallagher* does not totally bar the sale of parkland. Yet a city, even though empowered by statute to buy and sell land, is not totally free, under *Gallagher*, to dispose of parkland purchased with bond funds. By our holding in *Gallagher*, this court has followed the generally established rule of other jurisdictions that park property dedicated to and used by the public is somehow different from other city-owned property. See, *Carson v. State*, 240 Iowa 1178, 38 N.W.2d 168 (1949); *Rayor v. City of Cheyenne*, 63 Wyo. 72, 178 P.2d 115 (1947); *Wright v. Walcott*, 238 Mass. 432, 131 N.E. 291 (1921); *Aldrich v. City of New York*, 208 Misc. 930, 145 N.Y.S.2d 732 (1955); *Anderson, et al. vs. Mayor and Council of Wilmington*, 37 Del. Ch. 74, 137 A.2d 521 (1958); *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448 (1947). These states have established guidelines permitting the sale or diversion of public parkland under certain circumstances. Nebraska has followed this trend in our decision in *Carlson v. City of Fremont*, 180 Neb. 262, 142 N.W.2d 157 (1967). There, we permitted the diversion of city parkland to use for a fire station because the City of Fremont purchased the land from general funds and owned it free of restriction. We stated that a trust for the benefit of the public only protects parkland received by a city as a gift or purchase conditioned for a specific public use. In *Gallagher*, we have encountered the "purchase conditioned for a specific public use" situation. We have gone beyond our decision in *Carlson v. City of Fremont, supra*, and

restricted the sale of park property purchased with bond funds to only the situation where the property is determined no longer needed by the city and the Legislature has specifically authorized the sale of the property.

As a preliminary matter we must decide if the *Gallagher* rule is applicable to a city of the first class, such as Ralston. The facts in *Gallagher* concern a city park in Omaha. Under Neb. Rev. Stat. § 14-101 (Reissue 1987), Omaha is classified as a city of the metropolitan class because its population is greater than 300,000. A metropolitan-class city is empowered

> (1) to sue and be sued, (2) to purchase, lease, lease with option to buy, acquire by gift or devise, and hold real and personal property within or without the limits of the city for the use of the city, and real estate sold for taxes, (3) to sell, exchange, lease, and convey any real or personal estate owned by the city, in such manner and upon such terms as may be to the best interests of the city . . . .

§ 14-101.

In contrast, Ralston is defined under Neb. Rev. Stat. § 16-101 (Reissue 1987) as a city of the first class because it has between 5,000 and 100,000 inhabitants. Under § 16-201 cities of the first class are empowered

> (1) to sue and be sued; (2) to purchase, lease, lease with option to buy, or acquire by gift or devise, and to hold real and personal property within or without the limits of the city, and real estate sold for taxes for the use of the city in such manner and upon such terms and conditions as may be deemed in the best interests of the city; (3) to sell and convey, exchange, or lease any real or personal property owned by the city, *including park land*, in such manner and upon such terms and conditions as may be deemed in the best interests of the city . . . .

(Emphasis supplied.) As can be seen from the language of the statutes, the Legislature has seen fit to include within the enumerated powers of a first-class city the right to sell parkland. The identical right is absent from the statute empowering metropolitan-class cities. If we assume the *Gallagher* rule applies to cities of the first class, it is possible that the inclusion of the "parkland" language within the statute

empowering first-class cities comports with the "specific legislation" requirement of *Gallagher*, thus allowing the sale of the lakebed property in this instance. We do not find it necessary to decide today whether the *Gallagher* rule is applicable to first-class cities or whether the sale of parkland within a first-class city may be accomplished under *Gallagher* by resort to § 16-201. Assuming the *Gallagher* rule applies to Ralston as a first-class city, we find the restrictions of *Gallagher* inapplicable here because the lakebed property never existed as a park, and at the very least the City abandoned any intent to use the land as a park when it leased the property to Lakeview in 1967. In order to "trigger" the *Gallagher* rule, the property in controversy must be park property purchased with bond funds. In this case, only the reversionary interest, not the property itself, was purchased with bond money. Most importantly, however, the land itself was never established as a park by the City and is therefore not "park property." Because the land never existed as a park through inaction of the City, the *Gallagher* rule is not applicable, and the City is free to sell the property to Lakeview under its general statutory power in § 16-201.

Various jurisdictions have held that a municipality requires no special legislative sanction to sell land that was acquired for a public purpose, but which was never devoted or dedicated to that purpose. In *Palmer v. City of Albuquerque*, 19 N.M. 285, 142 P. 929 (1914), the New Mexico Supreme Court permitted the sale of a partially constructed city building because it had never been dedicated to public use. The court said that municipal property was not impressed with a public trust until it had been "given over," appropriated, or devoted to a public use. Property devoted to a public use could not be sold without statutory authority, but the building, in its partially constructed state, had not been impressed with a public trust so as to defeat the right of the city to sell it.

In *Lester v. Walker*, 177 Ark. 1097, 9 S.W.2d 323 (1928), the Supreme Court of Arkansas affirmed the right of the city to sell a piece of riverfront property to the county despite the fact that there was a city ordinance prohibiting the sale of riverfront parkland. The court said that this property was not the

riverfront parkland mentioned in the ordinance, but even if it was, the city still had the right to sell the land to the county because the land had never been dedicated to public use. The city had passed an ordinance declaring that the property would thereafter be used as a park, but the land was never used as a park. The mere passage of the ordinance was not enough to impart a trust upon the land, and the city had the right to revoke the ordinance declaring the land as park by authorizing its sale.

In *Schneider v. West New York*, 84 N.J. Super. 77, 201 A.2d 63 (1964), the plaintiffs sought to set aside a sale of land by the Town of West New York on the grounds that the land was parkland and prohibited from sale by statute. The court, based on the rationale in *Palmer v. City of Albuquerque, supra*, allowed the sale because the city had never put the land to park use. The court stated that a mere declaration by the city that the land was acquired for park purposes was not enough to make the land unsalable under the statute. The town was free to dispose of the land if it decided not to use it for its intended purpose before it had done anything to appropriate the land to such use.

Likewise, the Supreme Court of New York, in *Pearlman v. Anderson*, 62 Misc. 2d 24, 307 N.Y.S.2d 1014 (1970), permitted the village of Rockville Centre to divert certain public land for use as a village hall and parking lot without legislative authority. The plaintiffs in the action contended that the land was a park and was thus restricted to park use. The court stated that the land had never been dedicated as a park, proof of its use as a park was meager, and the land had been acquired for general municipal purposes with moneys from the general fund. Therefore, the property could have been used for any public purpose, and the fact that the city had cleaned up the property, planted some trees, and put in walkways was not sufficient to place the property in trust for park purposes, thereby restricting its sale.

Other jurisdictions have held that when property devoted to public use has been abandoned or become inadequate for use by the public, the municipality may sell it under its general statutory power to buy or sell property. In *Marshall v. Mayor of Meridian*, 103 Miss. 206, 60 So. 135 (1912), the Supreme Court

of Mississippi held that a municipality had the power to sell the old city hall in order to partially finance the building of a new city hall. The court stated that property devoted to public use is generally impressed with a trust that prohibits the sale of the property in some circumstances. However, when the property has ceased to be used for its intended purpose, the trust ends and the municipality can sell the property pursuant to its general statutory grant of power. The court stated that when the intended use ceases, no more reason exists for the rule prohibiting the sale of property held in trust for the public. In this case the intended use for the old city hall ceased when the city council decided to construct the new building.

The Supreme Court of Minnesota, in *Reed v. Village of Hibbing*, 150 Minn. 130, 184 N.W. 842 (1921), likewise affirmed the right of the Village of Hibbing to sell the city hall to a mining company so that the company could mine ore from the ground beneath the hall. The court stated that the village had the power, under its general statutory authority to buy and sell property, to sell the building because it had become inadequate for use because of its location.

The Texas courts have addressed the "abandonment" issue in relation to property purchased with bond funds. In *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448 (1947), the Texas Supreme Court affirmed a decision of the Court of Civil Appeal declaring valid the sale of certain mineral royalties to Moore. In about 1930, the City of Beaumont bought land with bond funds voted on and issued by the city for the purpose of constructing an airport. Later exploration of nearby tracts indicated that valuable minerals lay beneath the land. Moore purchased a one-sixteenth mineral royalty in and under the land for $13,772 from the city. Following this transaction, Moore entered into negotiations to sell part of the royalty to Gordon. Gordon eventually refused to accept conveyance of the royalty from Moore because he claimed that the City of Beaumont had no authority to convey the land and that the deed passed no title because the property had been purchased with bond funds voted on for airport construction. Moore filed suit against Gordon for specific performance and lost. Moore then demanded the return of his money plus interest from the city

and the city refused. In his suit against the city, Moore alleged, among other claims, that the city misrepresented its ability to pass good title to the airport land purchased with the bond funds. Therefore, it was necessary for the court to determine whether the city could sell to Moore an interest in the airport land. The majority of the analysis on this issue takes place in the lower court's opinion, which was affirmed by the Texas Supreme Court in its entirety. See, *City of Beaumont v. Moore, supra*; *Moore v. City of Beaumont*, 195 S.W.2d 968 (Tex. Civ. App. 1946).

The court held that the title the city passed to Moore and Moore to Gordon was not totally void, but was not the title Moore or Gordon had purchased. Because the land was purchased with bond funds, during the time the city council of Beaumont deemed it proper to use the land as an airport, the land was dedicated to that purpose and could not be used for any other purpose. A diversion of the land to a different purpose amounted to a diversion of the bond proceeds. However, the city need not use the land for the purpose forever. Voting the bonds did not require the city to operate the airport for all time to come. The city had the power to abandon the use of the land, but only when it exercised its discretion to do so on behalf of the public. Only after the land was in whole or in part lawfully abandoned by the city could the land be used for any other purpose.

The court concluded that the city's power to abandon use of land not needed for the purpose for which it was acquired would support the city's sale and conveyance of a royalty in land purchased with bond proceeds, and the city's deed would be expression enough of the city's intent to exercise that power. Thus the vendee would take title to the royalty subject to the contingency that the city might or might not abandon its use of the land. Therefore, the royalty interest was speculative, but not necessarily invalid.

As a preliminary matter, the City holds the lakebed property free of restriction. As discussed above, the City came to possess both the fee simple subject to condition subsequent as well as the reversionary interest, causing the two to merge into a fee simple absolute. The City is not prevented from alienating the

lakebed property through any restriction in the deed; likewise, no statute in Nebraska prohibits the sale of parkland. Therefore, we limit our discussion to whether or not the lakebed property was ever used as a park or was subsequently abandoned as a park by the City, thus enabling it to be sold to Lakeview.

We will first discuss whether the lakebed property was ever established as a park. Webster's Third New International Dictionary, Unabridged 1642 (1981) defines a park to be "a tract of land maintained by a city or town as a place of beauty or of public recreation . . . a large area often of forested land reserved from settlement and maintained in its natural state for public use (as by campers or hunters) . . . ." The key to determining whether or not the lakebed property was a park is the *City's* role in establishing or maintaining the property as a park. Random or particular use of the land by the public does not establish a park. It is the municipality's intention and resultant treatment of the land that determines whether it was a park. This may mean that a city places usual park amenities on the land such as bathroom facilities, park benches, water fountains, walkways, swimming pools, or even golf courses. It may also mean that the city preserves the land in its natural state as a wildlife refuge, a forest, or a camping spot for residents of the state. However, the determinative factor is the city's actions in regard to the land.

The district court held that the lakebed property was used as a park at best only sporadically and randomly and was therefore never dedicated to park use. We agree with the district court's conclusion but for different reasons. Although the bond issue funds voted on by the residents of the City in 1947 were intended to be used to purchase the reversionary interest in order to create a park on the lakebed property, the City never took any substantial steps in that direction. The determinative factor was the City's failure to dedicate the land to park use.

The City did almost nothing to the lakebed property. It did not build or maintain any bathrooms, picnic tables, water fountains, or other usual park conveniences on the property. It did nothing to promote or encourage use of the land as a public recreation area. Likewise, the City did nothing to preserve the

land in its natural state. It established no boundaries upon the land, promulgated no rules for camping or hunting, and made no effort to preserve wildlife on the land. With the exception of testimony regarding an abundance of stray dogs and rodents on the land, no evidence exists in the record that there was any wildlife on the property. Testimony in the record describes the land as a dump and swampy and full of mosquitoes. Pictures of the property before construction of the golf course show the property to be similar to a large overgrown vacant lot. It remained in this state for almost 20 years prior to the construction of the golf course. Testimony regarding the uses various Ralston residents made of the land concerns activities which any group of children or adults would make of a large area of vacant land. A vacant piece of land is not automatically branded a park because citizens use it to play football or to skate on a frozen lakebed. Since the City did nothing to establish the area as a park, it cannot simply be called a park because certain citizens participated in "parklike" activities on the property.

Additionally, the land was never dedicated to park use by the City. Black's Law Dictionary 412-13 (6th ed. 1990) defines dedication as

> [t]he appropriation of land . . . by the owner, for the use of the public, and accepted for such use by or on behalf of the public. . . .
>
> . . . .
>
> . . . A dedication may be express, as where the intention to dedicate is expressly manifested by a deed or an explicit oral or written declaration of the owner, or some other explicit manifestation of his purpose to devote the land to the public use. An implied dedication may be shown by some act or course of conduct on the part of the owner from which a reasonable inference of intent may be drawn
>
> . . . .

It is clear from the above definition that the operative act evidencing a dedication must be accomplished by the owner of the property. The owner must first "give over" the property to public use, allowing the public to accept it as such. This may be done either expressly or by implication through a course of

conduct. There is no evidence in the record of a formal dedication by the City. Given our above discussion, the City did not engage in any course of conduct that would give rise to an implied dedication. Until the decision to use the land as a golf course, the City did virtually nothing to the property but spray it for mosquitoes, mow certain accessible areas, and attempt to reduce the stray dog population. When the City decided to use the land as a golf course, it turned over all responsibility for the building and maintenance of the course to Lakeview. It assumed no role in the operation of the golf course except to collect the rent from Lakeview. Those actions, together with the passage of the ordinance and the issue of the bonds by the City, do not amount to a dedication or devotion of the property to park use. In this case, the City never "gave over" the lakebed property to public use, as required by the rule in *Palmer v. City of Albuquerque*, 19 N.M. 285, 142 P. 929 (1914). As in *Lester v. Walker*, 177 Ark. 1097, 9 S.W.2d 323 (1928), *Schneider v. West New York*, 84 N.J. Super. 77, 201 A.2d 63 (1964), and *Pearlman v. Anderson*, 62 Misc. 2d 24, 307 N.Y.S.2d 1014 (1970), a mere declaration or passage of an ordinance by the City declaring the land a park is not sufficient to impress a trust upon the land. The rules in those cases clearly require the municipality to do something more, something the City did not accomplish in regard to the lakebed property. Therefore, the City is free to sell the land under § 16-201 because the lakebed property was never dedicated or devoted to park use.

The City is also free to sell the lakebed property to Lakeview because it abandoned any pretense of using the lakebed property for public parkland when it leased the property to Lakeview for construction of the golf course. It is clear from the record that in the early 1960's the city council decided that the land would be better used as a golf course. The council members then began an active campaign to obtain a willing tenant for the land. Lakeview leased the land from the City and built and singlehandedly operated the golf course for 16 years. The City then determined that it would be in the City's best interest to sell the property to Lakeview and use the money to build a much-needed maintenance building. The City notified Lakeview it intended to sell the land, and Lakeview decided to

exercise the purchase option in the City-Lakeview lease. The City then declared the property surplus and went ahead with the sale.

The appellant claims that operating a golf course is a park use, thereby substantiating his allegation that the property was continuously used as a park until the sale to Lakeview. That would be the case provided the City operated the golf course or at the very least maintained a substantial degree of control over operation of the course. See, *Golf V. R. Co. v. City of Sioux City*, 222 Iowa 433, 269 N.W. 451 (1936) (golf course is considered a park use, and therefore the city is authorized to purchase the course as it would a park); *Clement v. O'Malley*, 95 Ill. App. 3d 824, 420 N.E.2d 533 (1981) (installation of golf driving range in city park is proper park purpose and did not breach the public trust because city park officials built and operated the course, public bodies controlled course use, the area would be devoted to a public purpose and open to the public, the diminution of the area of original use would be small, and none of the public use of the original area would be destroyed).

In this case the City neither owned, operated, nor maintained control over the course. The appellant attempts to overcome this problem by referring to our decision in *Omaha Parking Authority v. City of Omaha*, 163 Neb. 97, 77 N.W.2d 862 (1956), for the proposition that a public park leased to a private party may still be considered dedicated to the public as long as the lease does not violate the dedication. *Omaha Parking Authority, supra*, concerns a situation totally distinct from this case and is therefore inapplicable. Here, the City leased the land to Lakeview and allowed it to build, operate, and maintain the course free of any interference from the City. The lease provided only that Lakeview must build the golf course within a specified time period, must pay the agreed-upon rental to the City, and must keep the course open to the public 6 days per week. The City maintained no control whatsoever over operation of the course, but treated the lease arrangement with Lakeview as a profitmaking venture and as a way to put the lakebed property to good use. The City's actions were wholly inconsistent with maintaining or operating a public park, even

if that park was a golf course. Therefore, by leasing the land to Lakeview, the City abandoned any intent to use the land as a park. Following abandonment of the use, under the rule in *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448 (1947), the City was then free to use the land for any other purpose. It exercised this freedom by selling the property, under its general power to buy and sell property, to Lakeview.

In addition to leasing the land to Lakeview, the City also disposed of three additional parcels of property. Prior to entering into the Lakeview lease, the City abandoned two parcels of the land by selling them to various parties. Fred Abboud voted on and approved the sale of the Foxley parcel while he was a member of the city council. After entering into the lease with Lakeview, the council sold off another portion of the lakebed property to the American Legion. Selling off these parcels of land is also at odds with maintaining a park on the property and strongly evidences the City's intent to abandon use of the lakebed property as a park. The appellant's claim that the sale of the lakebed property is prohibited by *Gallagher v. City of Omaha*, 189 Neb. 598, 204 N.W.2d 157 (1973), fails because the City never dedicated the lakebed property to park use and, in the alternative, abandoned any use of the land as a park. The mere declaration by the Ralston City Council that the land was intended for future park use is not sufficient to establish the property as a park. Therefore, the *Gallagher* rule does not apply. Abboud's request for a permanent injunction prohibiting the sale of the land to Lakeview is denied.

## THE CONFLICT OF INTEREST THEORY

Abboud claims as error the district court's finding that Ralston Mayor Gerald Koch complied with § 18-301.01. Section 18-301.01(2), the statute in effect at the time of the filing of this case, has since been repealed and reenacted in Neb. Rev. Stat. §§ 49-14,103.01 and 49-14,103.07 (Reissue 1988). Section 18-301.01(2) prohibited any city officer from being directly or indirectly interested in any contract to which the city was a party. The statute also provided that an action may be brought within 1 year of the signing of the contract to have the contract declared void. The record indicates that Koch, a city

officer, owned a 12½-percent share of Lakeview and was therefore "interested" in the contract between the City and Lakeview. We declared in Abboud's first appeal to this court that Abboud's action to declare the contract void under § 18-301.01(2) was barred by the 1-year statute of limitations. However, we also stated that his action for a permanent injunction preventing the City and Lakeview from exercising the purchase option agreement in the lease was not similarly barred. Abboud now argues that the contract between the City and Lakeview is voidable because Mayor Koch was a shareholder in Lakeview and a city officer. Abboud again attempts to have this court declare the contract between the City and Lakeview void under § 18-301.01(2) despite the fact he is barred from doing so by his failure to comply with the § 18-301.01(2) 1-year statute of limitations. The remedy provided by § 18-301.01(2) is not available to Abboud because he has failed to comply with the statute. Therefore, Abboud may not claim the district court erred by failing to afford him this remedy.

We said in our opinion accompanying Abboud's first appeal that he may seek a permanent injunction prohibiting the City and Lakeview from exercising the purchase option in the lease. Abboud does not make it clear whether or not he seeks this remedy, but we will assume he does based on his continuing claim that the sales contract between the City and Lakeview was burdened with a conflict of interest. In other words, we believe Abboud seeks to have the execution of the purchase agreement between the City and Lakeview permanently enjoined because Mayor Koch was both a shareholder in Lakeview and an officer of the City. Since the sale has already taken place, this would involve reconveyance of the property to the City. The district court found that no conflict of interest existed. We agree. We will look to § 18-301.01(3) for guidance concerning the interested party's ability to "cure" the conflict.

Section 18-301.01(3) provides that the remedy available under § 18-301.01(2) will not apply if the interested officer

(a) Makes a declaration on the record to the governmental body responsible for approving the contract regarding the nature and extent of his or her

interest, prior to official consideration of the contract;

(b) Does not vote on the matter of granting the contract, except that if the number of members of the board declaring an interest in the contract would prevent the board, with all members present, from securing a quorum on the issue, then all members may vote on the matter; and

(c) Does not act for the city or village which is party to the contract as to inspection or performance under the contract in which he or she has an interest.

The record indicates that Koch was not the mayor in June 1984, when the city council declared the property surplus, and in November 1984, when the council passed the ordinance selling the property to Lakeview. Koch was sworn into office on December 3, 1984. Koch also testified that he revealed his ownership in Lakeview to the city council and that any time any business concerning Lakeview came before the council, he would declare his conflict and leave the council meeting. He also testified that he wrote a letter to the council or to the clerk of the City informing the City of his conflict. There is no evidence in the record that Koch attempted to influence anyone in any way relating to the contract. Therefore, Koch has complied with all the requirements of § 18-301.01(3) and has "cured" any conflict he may have had in the City-Lakeview transaction. No conflict existed, and therefore Abboud is not entitled to an injunction barring execution of the purchase option between the City and Lakeview. Abboud's claim that Koch had a conflict of interest because he was aware that certain condemnation proceeds would enure to Lakeview is so lacking in merit that we will not discuss it.

## THE REMONSTRANCE THEORY ISSUE

Abboud alleges that the Ralston City Council was prohibited from confirming the sale to Lakeview because his petition in remonstrance was properly filed pursuant to § 16-202. Section 16-202 provides that

if a remonstrance against such sale signed by legal electors thereof equal in number to thirty percent of the electors of such city voting at the last regular municipal election held

therein, be filed with the governing body of such city within thirty days of the passage and publication of such ordinance, said property shall not then, nor within one year thereafter, be sold.

Abboud filed remonstrance petitions with the Ralston City Council, and the election commissioner verified 836 petition signatures, 16 more than the 820 needed to comprise 30 percent of the electors of the City, as required by § 16-202. The city attorney then reviewed the petitions and recommended invalidating 55 signatures. Based on the city attorney's findings, the city council then rejected the petitions and confirmed the sale of the lakebed property to Lakeview. Abboud requests that this court review the actions of the election commissioner, the city attorney, and the Ralston City Council de novo based on this court's decision in *Chan v. City of South Omaha*, 85 Neb. 434, 123 N.W. 464 (1909). He claims that the remonstrance petitions contained the requisite number of signatures because § 16-202 requires only that signers of the petitions be "legal electors" rather than registered voters, and therefore the decision of the city council to reject the petitions was wrong.

Pursuant to Neb. Rev. Stat. § 25-1901 (Reissue 1985), a judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court may be reversed, vacated, or modified by the district court. Neb. Rev. Stat. § 25-1903 (Reissue 1989) provides that the proceedings to obtain a reversal, vacation, or modification must be made by petition entitled "petition in error" filed in a court having the power to reverse, vacate, or modify the decision, and must set forth the assigned errors charged to the lower tribunal. Neb. Rev. Stat. § 25-1905 (Reissue 1989) requires that the plaintiff in error must file with the petition in error a transcript of the proceedings containing the final judgment or order sought to be reversed, vacated, or modified.

A city council is a "tribunal" whose decision can be reversed, vacated, or modified by a court of proper jurisdiction. *Roberts v. City of Mitchell*, 131 Neb. 672, 269 N.W. 515 (1936). A city council exercises judicial functions in determining questions of

fact, and if error proceedings are not filed to review the decision, it becomes final. *Hiddleson v. City of Grand Island*, 115 Neb. 287, 212 N.W. 619 (1927). If no statutory right to appeal from a decision of a city council exists, then proceedings in error are the only remedy afforded the plaintiff. *Fisher v. Housing Auth. of City of Omaha*, 214 Neb. 499, 334 N.W.2d 636 (1983). Since Nebraska does not provide a statutory right of appeal from the decision of a city council, Abboud's only remedy was to file a petition in error in the district court pursuant to § 25-1903.

The purpose of a petition in error proceeding is to determine whether the decision of the lower tribunal is in accordance with the law. *Dlouhy v. City of Fremont*, 175 Neb. 115, 120 N.W.2d 590 (1963). In *Brunken v. City of Omaha*, 225 Neb. 410, 417, 405 N.W.2d 595, 599 (1987), we stated:

> " 'The general rule is that if it appears in such cases that such agency or body has acted within its jurisdiction and that all of the jurisdictional facts essential to uphold its findings and orders are sustained by some competent evidence, such findings and orders will be upheld in error proceedings to the district court and on appeal to this court.' "

In *Andrews v. City of Fremont*, 213 Neb. 148, 151, 328 N.W.2d 194, 196 (1982), we stated: "A petition in error is designed to review the decision of the inferior tribunal. It is not to act as a super legislative or administrative agency to come to an independent conclusion." In order to have obtained review of the lower tribunal's decision, the petitioner must have filed in the reviewing court a transcript containing the lower tribunal's order within 1 calendar month of issuance of the final order. See, *Meier v. State*, 227 Neb. 376, 417 N.W.2d 771 (1988); *Fisher v. Housing Auth. of City of Omaha, supra*. We held in *Andrews, supra*, that the transcript filed in the reviewing court must contain the ordinances relied upon by the city council, as well as sufficient evidence for the reviewing court to determine whether the council's decision was correct.

Our decision in *Chan v. City of South Omaha, supra*, is distinguishable and therefore inapplicable to this case. In *Chan*, the city council did not overrule but, rather, ignored a

remonstrance petition filed by certain property owners. The city council made no decision as to whether the petition contained the amount of "frontage foot" owners required by the statute, nor did the petitioners have a hearing on the matter. Therefore, there was no decision by the council upon which the district court could find error. In that case we decided that whenever the sufficiency of a remonstrance petition is questioned in court, the fact should be determined without reference to the actions of the city council. The multitude of Nebraska cases following *Chan* that concern review of decisions of lower tribunals clearly establish that the review must be conducted upon filing of a petition in error unless another right of appeal is given through statute. This could not be accomplished in *Chan* because there was no decision issued by the lower tribunal to review. In this case it is clear that the Ralston City Council, in a public council meeting and against the objections of Abboud, decided to reject the remonstrance petitions filed by Abboud. This decision was final, judicial in nature, and may be reviewed only upon the filing of a petition in error in the district court.

Abboud has failed to comply with the procedural requirements for review of a decision of a tribunal such as the Ralston City Council. He is incorrect in asserting that this court's as well as the district court's standard of review of the actions of the Ralston City Council is de novo. Abboud's only remedy was to file a petition in error requesting the district court to reverse or modify the decision of the Ralston City Council. This court could then review the district court's determination on appeal. He has failed to file a petition in error, and therefore the district court and this court are without jurisdiction to hear his claim. The district court assumed that Abboud's amended petition was a petition in error for the purpose of concluding that the word "elector" in § 16-202 required that signers of the petitions be registered voters. This does not mean that the amended petition was a petition in error. Abboud's petition did not contain a record of the Ralston City Council hearing at which the remonstrance petitions were rejected. It did not contain a copy of the final order of the city council, as required by *Meier, supra,* and *Andrews, supra,*

although Abboud does make reference to the language in ordinance No. 765. Abboud did not specify what errors of law were committed by the Ralston City Council in reaching its decision. This is not sufficient to constitute a petition in error. Abboud has not properly presented his claims before either the district court or this court. Therefore, we are without jurisdiction to consider his claim.

## CONCLUSION

An injunction is an equity action. *Federal Land Bank of Omaha v. Swanson*, 231 Neb. 868, 438 N.W.2d 765 (1989). Permanent injunctive relief is available only where there is no adequate remedy at law, probable success on the merits has been demonstrated, and the balance of equities favors the moving party. See, *Aro Inv. Co. v. City of Omaha*, 179 Neb. 569, 139 N.W.2d 349 (1966); 43 C.J.S. *Injunctions* § 16 (1978). We have discussed above the right of the City to sell the lakebed property to Lakeview and have determined that the City is permitted to do so because the lakebed property was never dedicated to public use as a park, and in the alternative, the City lawfully abandoned use of the property as a park when it leased the land to Lakeview. Therefore, Abboud has failed on the merits of his claim. We will also assume that Abboud has no adequate remedy at law because the lakebed property is unique, and Abboud, as a citizen of Ralston, cannot be compensated by money damages for loss of ownership of the property by the City. However, we do not believe that Abboud has demonstrated that the balance of equities favors him as the moving party, and therefore he is not entitled to injunctive relief in this action.

Abboud claims that he relied on the lakebed property's continued use as a public park when he purchased his lot located near the golf course. In other words, he desires that the property continue to be used as a golf course for fear the value of his property will decrease. While this fear is a legitimate one, we do not feel that Abboud's desire to maintain his land value outweighs the loss that the City and Lakeview would incur if Lakeview is required to deed the land back to the City. As the diagram on page 328 indicates, the golf course is constructed

both on the lakebed property and on the adjoining piece of property purchased by Lakeview from the City. This adjoining piece of property was not purchased from the Eipperles with the park bond funds and is therefore not burdened with a public trust under *Gallagher v. City of Omaha*, 189 Neb. 598, 204 N.W.2d 157 (1973). None of our above discussion concerning the applicability of the *Gallagher* rule pertains to this piece of property. Lakeview holds title to this land free from restriction. The only property Abboud seeks to have revert to ownership by the City is the lakebed property purchased with the bond funds. This would necessitate placing the ownership of a single golf course in the hands of two different parties; thus Lakeview and the City would each own a portion of the course. Consequently, the golf course property would be rendered virtually unmarketable and its value would dramatically decrease.

Since Abboud has insisted that this property was and is a public park, under the rules reiterated in *Golf V. R. Co. v. City of Sioux City*, 222 Iowa 433, 269 N.W. 451 (1936), and *Clement v. O'Malley*, 95 Ill. App. 3d 824, 420 N.E.2d 533 (1981), to maintain the property as a public park the City would have to operate the course itself. In order to accomplish this the City would have to buy or lease back the adjoining piece of property from Lakeview and thus become the sole owner or operator of the golf course, something it sought to avoid doing in the first place by leasing and then selling the land to Lakeview. Since Lakeview's portion of the golf course is worthless by itself, Lakeview would likely sell or lease the land to the City, but only at a high price in order to recoup costs that went into building and maintaining the golf course.

Even if we assume that the land is conveyed back to the City, Abboud has not proposed a manner in which Lakeview can be compensated for the building and construction expenses. The lease between the City and Lakeview expressly provided protection for Lakeview in the form of a right of first refusal if the City ever decided to sell the property or Omaha ever decided to annex Ralston. Obviously both the City and Lakeview contemplated the eventual sale of the land and agreed to the purchase option and the rental price, as well as to the purchase price for the land. If the land were to be conveyed back to the

City, at the very least Lakeview is entitled to a refund of the purchase price with interest. In turn, the City should receive rent on the property for the time Lakeview owned the property. However, a refund of the purchase price does not compensate Lakeview for the money it spent building the golf course. The $90,000 price agreed upon for the property was applicable only to Lakeview. Reflected in the price was the fact that Lakeview had already spent a large amount of money constructing the golf course. If the City had offered the land for sale to another party, the price certainly would have reflected the value of the land as improved with the golf course. Undoubtedly this price would have been higher than the $90,000 price agreed upon between the City and Lakeview because the land was worth more improved with the course. A refund to Lakeview of only the $90,000 purchase price would not fully compensate Lakeview for the amount expended on the golf course. Lakeview would be forced to take a loss on the construction costs of the course.

In summary, Abboud has not demonstrated how the sale of the lakebed property to Lakeview has damaged him sufficiently so as to outweigh the potential detriment to the City and Lakeview. Clearly, the hardships likely incurred by the City and Lakeview in the event the property is deeded back to the City outweigh any concern Abboud may have regarding his property values. Abboud has not demonstrated how his situation will be any different now that Lakeview owns the property than it was when the City owned the land. Abboud's request for injunctive relief is denied. The title to the lakebed property is to remain with Lakeview. The decision of the district court is affirmed.

AFFIRMED.

CAPORALE, J., not participating.