THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MALCOLM GRAY, Defendant-Appellant.

Fourth District   No. 4—91—0011

Opinion filed December 5, 1991.

Daniel D. Yuhas and Gloria Ann Morris, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Defendant, Malcolm Gray, was convicted by a jury of official misconduct, in violation of section 33—3(b) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 33—3(b)), and sentenced to 30 months' probation. The trial court imposed various probationary conditions upon defendant, including a six-month jail sentence and a $60,000 restitution payment. On appeal, defendant argues that the official misconduct statute does not apply to the facts of this case. We agree and reverse.

## I. FACTS

The facts herein are essentially undisputed. Accordingly, we will discuss them only to the extent necessary to put defendant's argument in proper context.

In September 1982, defendant was hired as a janitor by the Illinois Veterans Home (Home) in Quincy, Illinois. The Home is run by the Illinois Department of Veterans Affairs. During the course of a 30- to 45-minute intake interview, the personnel manager gave defendant various documents that contained lengthy lists of the rules of his employment. As described by defendant, his job at the Home was "to swing a mop. I was a janitor." The personnel manager described defendant's position as that of a housekeeper, doing general cleaning, sweeping, dusting, and the washing of windows and walls.

In 1987, defendant met Robert Jones when Jones became a resident of one of the buildings on the Home's campus. At the time, Jones was in his mid-70's and defendant was in his mid-50's. Defendant was generally friendly with the residents and would visit with them as he performed his janitorial duties. Defendant saw Jones daily, spoke with him frequently, and they became friends. Jones testified that defendant was a housekeeper in the building in which Jones lived, so Jones would "see him every day as he would clean up [the living quarters.]" Jones would give defendant bread recipes, and defendant would bake bread on his days off and bring it to Jones. Defendant also occasionally ran errands for Jones into Quincy to pick up special items that Jones did not have available to him at the Home.

During the course of their conversations, defendant told Jones that defendant's dream was to own and operate a restaurant. Defendant also told Jones about having a potential investor for the restaurant. Jones frequently gave defendant advice about how defendant should run the restaurant once it opened. Ultimately, the investor backed out. Defendant told Jones the sad news, and sometime later, in May 1988, Jones approached defendant and offered to invest $60,000 in defendant's restaurant. Because defendant had not known (and had no way of knowing) that Jones had any money, he was astounded by the offer. The subject of Jones' making this investment had never before come up, nor had defendant ever asked Jones for any money. Defendant considered Jones' offer to invest for a few days. Before accepting it, he took Jones to see the building in Quincy that defendant and his wife purchased in 1974 wherein they planned to open the restaurant.

After defendant accepted Jones' offer, Jones obtained $60,000 of his savings and gave the money to defendant. Jones also drafted a document in which defendant assigned his interest in the building to Jones in exchange for the $60,000.

Defendant began to renovate the building, and in October 1988, he resigned his job as a janitor at the Home and began to work full time at the restaurant. Defendant took Jones to the building on several occasions to see the progress of the renovations.

Defendant opened the restaurant in January 1989, but it never proved profitable. He wound up closing it less than eight months later.

Starting in February, Jones had a falling out with defendant when Jones had an argument with the accountant defendant hired to keep the books for the restaurant. Jones did not like how the books were being kept and thought there was something fraudulent about them. Jones also did not like the fact that, at the accountant's suggestion, defendant had incorporated the new restaurant. Because defendant did not understand any of the bookkeeping discussions, he stayed out of the arguments between the accountant and Jones.

In April 1989, Jones demanded that defendant return Jones' investment. However, defendant had spent all of the money on the restaurant. Jones hired an attorney and filed suit against defendant and his wife, seeking the return of the $60,000 investment. At the time of defendant's trial in the present case, that civil action was still pending.

In July 1990, the State charged defendant with official misconduct, alleging that he,

> "a public employee, being an employee of the Illinois Veterans Home, while acting in his official capacity, knowingly performed an act which he knew to be forbidden by law to perform, that law being the Department of Veterans Affairs Illinois Veterans Home Personal Conduct Rules For Employees, to wit: having any financial transactions with clients or members, by receiving [cash] from Robert Jones and entering into a restaurant business with Robert Jones."

Section 33—3(b) of the Code, in pertinent part, reads as follows:

> "Official Misconduct. A public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts:
> ***

(b) Knowingly performs an act which he knows he is forbidden by law to perform[.]" Ill. Rev. Stat. 1989, ch. 38, par. 33—3(b).

One of the documents the personnel manager gave defendant when she hired him contained a rule that prohibited Home employees from "soliciting or accepting gratuities for services rendered, borrowing from clients or members, or loaning money to clients or members, [and] having any financial transactions with clients or members." The phrase "clients or members" meant residents of the Home, such as Jones. Defendant acknowledged that he was generally aware of the many rules of the Home and testified that his basic understanding was "that he was to treat the residents as he would want to be treated." He also acknowledged that he understood his involvement with Jones violated a rule against financial dealings with residents of the Home and that he could lose his job as a result. However, he insisted that he did not know he was violating any law.

## II. ANALYSIS

In *People v. Steinmann* (1978), 57 Ill. App. 3d 887, 897, 373 N.E.2d 757, 764, the court had to resolve whether a defendant convicted of official misconduct was acting in his official capacity when he performed certain acts. The court wrote the following: "[T]he offense [of official misconduct] was designed to reach those situations where a public officer or employee has in some fashion *exploited his official position to the detriment of the public good.*" (Emphasis added.) (*Steinmann*, 57 Ill. App. 3d at 897, 373 N.E.2d at 764.) In *People v. Adams* (1978), 64 Ill. App. 3d 547, 549, 381 N.E.2d 738, 740, the court cited *Steinmann* approvingly and held that official misconduct was designed to reach those situations where a public officer or employee had in some fashion exploited his official position to the detriment of the public good. In *People v. Kleffman* (1980), 90 Ill. App. 3d 1, 3, 412 N.E.2d 1057, 1060, the court also cited *Steinmann* approvingly and held that "[a]n act is performed in one's official capacity if it is accomplished by exploitation of his position as a public officer or employee." See also *People v. Samel* (1983), 115 Ill. App. 3d 905, 908, 451 N.E.2d 892, 895.

■■ Two elements of the offense of official misconduct as charged in the present case are that (1) defendant knowingly performed an act which he knows he is forbidden *by law* to perform, and (2) he did so *in his official capacity*. Thus, the first question which this court must address is what is the "official capacity" on this record of a janitor who is employed "to swing a mop" at a State institution such as the

Home? Our answer is that there is no such "official capacity." Indeed, to even ask the question shows the absurdity of the State's efforts to include this defendant within the official misconduct statute.

■ We view the holding in *Steinmann* and its progeny as meaning that a State employee has an "official capacity" within the meaning of section 33—3(b) of the Code only if he has some official position that could be exploited in some fashion to the detriment of the public good. On the facts of this case, just what can the State contend was defendant's "official position" that he could exploit to the detriment of the public? Perhaps he would not swab down the floors of the Home's buildings as thoroughly as he once did nor clean the toilets as diligently. Or perhaps he would fail to keep toilet paper rolls in the bathroom. Of such stuff is not "exploitation of the public" made.

As we stated earlier, when the defendant was hired, he was given several documents which contained multiple rules of conduct. One of those documents contained the rule, which we quoted and which was paraphrased in the charge against defendant, prohibiting employees from "accepting gratuities from *** or having any financial transactions with clients or members." However, the defendant was also given another list of rules, entitled "Code of Conduct for State Employees," which described itself as applicable to all employees and all State departments, boards, commissions, and agencies. Paragraph 5 thereof reads as follows:

> "*No* officer or *employee* may solicit, accept, or *agree to accept* gifts, *loans, gratuities*, discounts, favors, hospitality, or services from any person [known] to have substantial economic interests, distinct from those of the general public and *which may be affected by actions of such officer or employee in the performance of his official duties, under circumstances from which it could reasonably be inferred that a major purpose of the donor is to influence him in the performance of his official duties.*" (Emphasis added.)

We emphasize that the case before us is not one in which an elderly, bedridden patient looks to a housekeeper to perform those tasks the patient can no longer perform himself and that are necessary to the patient's well-being and proper hygiene. Instead, this is a case in which (at most) defendant abused a friendship that developed between two men of equal discernment, neither of whom was dependent in any way on the other.

Although the line we draw in this holding regarding when a State employment constitutes an "official capacity" may not be as bright as

we might like, we have no trouble at all discerning its clear boundaries when evaluating this defendant's employment duties as a janitor.

We note that usually no question arises about the official capacities of the defendants in official misconduct cases (other than the present case) that have gone through the appellate process. For instance, consider the following official misconduct cases and the positions held by the defendants therein: *Steinmann* (police lieutenant); *Kleffman* (mayor); *Samel* (police officer); *People v. Bassett* (1988), 169 Ill. App. 3d 232, 523 N.E.2d 684 (deputy county assessor); *People v. Smith* (1965), 57 Ill. App. 2d 74, 206 N.E.2d 463 (police officer); *People v. Locascio* (1985), 106 Ill. 2d 529, 478 N.E.2d 1358 (police officers); and *People v. Scharlau* (1990), 141 Ill. 2d 180, 565 N.E.2d 1319 (members of city council). We do not view the absence of janitors from this list as inadvertent.

■ Defendant also argues on appeal that the employment rule he is alleged to have violated does not rise to the level of "an act which [defendant] knows he is forbidden by law to perform," as required by section 33—3(b) of the Code. (Ill. Rev. Stat. 1989, ch. 38, par. 33—3(b).) In response, the State cites *Samel* and claims that the rule prohibiting Home employees from having any financial transactions with residents thereof was "a properly promulgated administrative rule or regulation and was an expression of legislative policy and was therefore a law as the term is used in [section 33—3(b) of the Code.]" This argument, however, does not accurately portray the holding in *Samel*, which is as follows:

> "A properly promulgated administrative rule or regulation, like a civil statute, is an expression of legislative policy—not in the sense that a rule constitutes legislation [citation], but, rather, because an agency *in the proper exercise of its rule making power* gives expression to legislative policy. Indeed, when an administrative agency exercises its rule making power, it performs a quasi-legislative function. [Citation.] Administrative rules and regulations have the force and effect of law and, like a statute, enjoy a presumption of validity. [Citations.] Neither at the trial court level nor on appeal has the defendant challenged the validity of the regulation in question on the basis that it was not properly promulgated pursuant to legislative authority or that it was not binding on him." (Emphasis added.) *Samel*, 115 Ill. App. 3d at 910, 451 N.E.2d at 896.

All the record before us demonstrates regarding the rule of employment in question is that someone in authority at the Home thought this rule to be desirable, included it in the list of employment

rules to be passed out to all employees, and defendant was given a copy. Indeed, the Home's personnel manager testified that the list of rules that contained the employment rule in question was generated by the Home's administrative staff and applied to no other facility of the Department of Veterans Affairs. We have serious misgivings as to whether a mere rule of employment, without more, meets the standard of section 33—3(b) of the Code, prohibiting acts which an employee knows he is forbidden by law to perform. To illustrate our concerns, we list the following other conditions of defendant's employment selected from a series of 11 specific conditions entitled "Employee Violations of a More Serious Nature (these can lead to suspension without pay or immediate discharge, even on the first offense)," in which the employment rule at issue in the present case (designated as paragraph f) was contained:

"a. Deliberately refusing to obey the orders of a supervisor. Using obscene or abusive language.

b. Disobeying instructions, procedures and policies, whether through neglect, procrastination or deliberate disobedience.
***

d. Coming to work under the influence of alcohol or unprescribed narcotics or drugs or using or possessing drugs or alcohol while on facility property. Refusing to be tested if there is reasonable cause to suspect such influence.

e. *** [K]eeping a member out of bed longer than necessary and/or prescribed; using vulgar or disrespectful language or slang expressions that degrade a client or member's race, national origin or religion, ridiculing a client or member and any other similar acts. An employee is also subject to disciplinary action if he/she witnesses any abuse or mistreatment of a member or client and does not report it promptly to his/her supervisor.
* * *

h. Deliberately *** abusing property that belongs to the [Home, fellow employees, visitors, or residents.]
***

j. Deliberately interfering with or delaying the work of other employees.

k. Engaging in unlawful or indecent conduct on Department or facility premises within or outside regular work hours."

At the sentencing hearing in this case, the trial court similarly addressed this list of employment rules and stated the following:

"And in sentencing Mr. Gray I will repeat what I said earlier, that I have never seen a case like this. And [defense counsel] has indicated he has not either. Mr. Gray is charged not with defrauding anybody, not with taking advantage of anybody, not with cheating anybody. He's charged with violating a rule that says you cannot have financial transactions with clients. Those same rules that say you cannot have financial transactions with clients also say you cannot swear in the presence of a client. Under the stand taken by the People, Mr. Gray could be prosecuted for a Class III Felony for swearing in front of Mr. Jones. That doesn't make any sense at all to me.

\*\*\*

So I am not so certain in my own mind that the State has properly charged the Defendant or has filed a proper charge. \*\*\* I do hope that the issue is brought before an Appellate Court and they can rule on whether or not this is really a crime, quite frankly.

The evidence was in this case, that Mr. Jones, who testified here and at the trial, was aware of Mr. Gray's desire to have a restaurant and that Mr. Jones offered to give the money to Mr. Gray and that Mr. Gray, the first time, did not accept it but put Mr. Jones off.

Mr. Jones has impressed the court with his knowledge. He is, as Mr. Heck said in closing argument, Mr. Jones is as sharp as a tack. And he exhibited that here once again. This isn't a case where an elderly, frail gentlemen was taken advantage of by any means. I believe it was a case where Mr. Jones thought he had a chance to help Mr. Gray and at the same time make an extra dollar or two for himself.

So I don't want any indications to come out, therefore, that the court is in any way finding that any illegality was done by Mr. Gray other than the violation of this rule. And like I said, I am not so certain that the Appellate Court will affirm this conviction if it's appealed. \*\*\* I would not be surprised if the Appellate Court would rule that this is not a criminal violation."

As did the trial court, we express our skepticism that a janitor in State employment commits a Class 3 felony by committing any of the "employee violations of a more serious nature." That list no doubt includes a lot of bad things an employee might do or say, and the State might be fully justified in suspending an employee without pay or immediately discharging him or her for such conduct. However, we can-

not believe that deeming such behavior felonious is what the legislature had in mind when it enacted the official misconduct statute.

For the reasons stated, we reverse the judgment of defendant's conviction.

Reversed.

KNECHT and LUND, JJ., concur.